UNITED STATES of America,
Plaintiff-Appellee,

v.

Edgar HERNANDEZ–SALAZAR,
Defendant-Appellant.

No. 86–5398.

United States Court of Appeals,
Eleventh Circuit.

April 3, 1987.

Guy W. Turner, Miami, Fla., for defendant-appellant.

Leon B. Kellner, U.S. Atty., Paul A. DiPaolo, Sonia O'Donnell, Nancy L. Worthington, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before KRAVITCH and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

In 1984, Congress amended 31 U.S.C. § 5317 to add a provision to expand the authority of Customs officers to search persons and property entering and departing the United States for currency reporting violations. In this issue of first impression,[1] the constitutionality of the 1984 amendment to 31 U.S.C. § 5317(b)[2] is challenged.

Appellant Edgar Hernandez-Salazar and two codefendants were indicted for currency reporting offenses in connection with appellant's attempt to transport in excess of $200,000 in United States currency in a checked bag on a flight from Miami to Medellin, Colombia. Count 1 of the indictment charged Adolfo Leon Gomez,[3] Hugo Rios[4] and appellant with conspiracy to defraud the Internal Revenue Service by failing to file a United States Customs Form 4790, Report of International Transportation of Currency or Monetary Instruments, in connection with transportation of an amount of United States currency in excess of $10,000 from Miami to Medellin, Colombia.[5] 18 U.S.C. § 371. Count 2 charged

---

1. To our knowledge, no other circuit has ruled on the constitutionality of this section.

2. All references to 31 U.S.C. §§ 5316 and 5317 are to those sections as amended in 1984. Prior to the 1984 amendments, § 5317(b) contained the forfeiture provisions that are now § 5317(c). Effective January 27, 1987, Congress once again amended § 5317(b). This case, however, is governed by the amendment version of § 5317(b).

3. Codefendant Gomez became a fugitive prior to trial and is not a party to this appeal. The indictment alleges that Gomez met with Hernandez-Salazar in Medellin, Colombia and instructed Hernandez-Salazar to travel to Miami, Florida for the purpose of obtaining a quantity of United States currency.

4. The government's case against codefendant Rios was dismissed. The indictment alleges that Rios met with Hernandez-Salazar in Miami and gave Hernandez-Salazar approximately $203,114 in United States currency for Hernandez-Salazar to transport to Colombia.

5. 31 U.S.C. § 5316 requires that:

 (a) ... a person or an agent or bailee of the person shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly—

 (1) transports or has transported monetary instruments of more than $10,000 at one time—

 (A) from a place in the United States to or through a place outside the United States;

 ....

 (b) A report under this section shall be filed at the time and place the Secretary of the Treasury prescribes. The report shall contain the following information to the extent the Secretary prescribes:

 (1) the legal capacity in which the person filing the report is acting.

 (2) the origin, destination, and route of the monetary instruments.

 (3) when the monetary instruments are not legally and beneficially owned by the person transporting the instruments, or if the person transporting the instruments personally is not going to use them, the identity of the person that gave the instruments to the person transporting them, the identity of the person who is to receive them, or both.

 (4) the amount and kind of monetary instruments transported.

 (5) additional information.

31 U.S.C. § 5322 provides criminal penalties for violations of § 5316: "(a) A person willfully violating this subchapter or a regulation prescribed under this subchapter ... shall be fined

appellant, Gomez and Rios with the substantive offense of knowingly failing to file the required report, in violation of 31 U.S.C. §§ 5316, 5322.[6] 18 U.S.C. § 2. Count 3 charged appellant with making a false, fraudulent and fictitious statement to a United States Customs Service agent. Appellant allegedly stated that he was not carrying more than $10,000 in monetary instruments when in fact he was carrying approximately $203,000 in United States currency. 18 U.S.C. § 1001.[7]

The issues before this court arise from appellant's motion to suppress the evidence against him as the product of an illegal search. After an evidentiary hearing, the magistrate recommended that all evidence against appellant be suppressed as the fruit of an illegal search; he found the statute granting authority to Customs officers to search outgoing luggage without a search warrant on the basis of "reasonable cause," 31 U.S.C. § 5317(b), unconstitutional on its face.[8] After hearing oral argu-ment on the motion, the district court sustained the government's objections and reversed the magistrate's recommendation.

The parties waived their rights under Fed.R.Crim.P. 23(c) to special findings of fact, and the case proceeded to a bench trial on stipulated facts.[9] Appellant was convicted on all three counts and sentenced to three concurrent three year sentences and $150 fine.

Initially, the parties dispute the role that the magistrate's factual findings should play in our decision. Appellant contends that the magistrate's factual findings are entitled to deference because the district court held no evidentiary hearing and made no factual findings.

We conclude that the magistrate's findings are not entitled to deference in this case.[10] The district court reversed the magistrate's recommendation without making factual findings.[11] The parties stipu-

---

not more than $250,000, or imprisonment [sic] not more than five years, or both." *See also* 31 C.F.R. §§ 103.23, 103.49.

6. *See supra* note 5.

7. 18 U.S.C. § 1001 provides that:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

8. The magistrate did not reach the issue of whether the statute was constitutional as applied.

9. Although the stipulation does not appear in the record, the government indicated at oral argument that the parties stipulated to the testimony before the magistrate.

10. We note, however, that our discussion of the facts of this case in section I *infra* is, with the exception of the finding that "[t]he weight of the bag played no part in its selection," entirely consistent with the facts found by the magistrate. We conclude that the unequivocal testimony of Agent Headley at the suppression hearing, that the weight of appellant's bag did play a role in his decision to search, warrants such an implied finding where the district court concluded that Agent Headley did have reasonable suspicion to search appellant's bag.

11. The magistrate's report and recommendation held only that § 5317(b) is facially unconstitutional and that the evidence against appellant must be suppressed as fruit of an illegal search. The magistrate did not reach the issue of whether the agents' actions were consistent with § 5317(b) or whether the application of that section was constitutionally permissible. The government's timely objections to the magistrate's report and recommendation recited facts that are inconsistent in part with the magistrate's factual findings. The government also objected to the magistrate's legal conclusions. Given these objections, the district court was obligated to conduct a de novo review. *See United States v. Lewis*, 621 F.2d 1382, 1386 (5th Cir.1980), *cert. denied*, 450 U.S. 935, 101 S.Ct. 1400, 67 L.Ed.2d 370 (1981).

On review, the district court reversed the magistrate's recommendation and decided the other issues not considered by the magistrate. The court concluded that:

1. 31 U.S.C. section 5317(b) is not void for vagueness since subsection (b) is a procedural limitation on the authority of Customs to perform outbound inspections.

2. The court reads "reasonable cause" to mean reasonable suspicion to search.

3. Inspector Headly's [sic] search of the suitcase belonging to the Defendant Hernandez-Salazar was based on the reasonable suspicion that a currency violation had occurred, and was therefore a lawful search.

4. The checks and currency taken from the Defendant's handbag in the jetway entrance just before boarding was also lawful.

lated for trial to the testimony at the suppression hearing, not to the magistrate's factual findings.[12] The parties also waived their right to special findings of fact under Fed.R.Crim.P. 23(c).[13] Where the defendant waives his right to special findings under Rule 23(c), findings will be implied on appeal in support of the judgment if the evidence, viewed in the light most favorable to the government, warrants them. *United States v. Ochoa*, 526 F.2d 1278, 1282 n. 6 (5th Cir.1976); *United States v. Gant*, 691 F.2d 1159, 1163 (5th Cir.1982). *See also* 8A J. Moore, *Moore's Federal Practice* ¶ 23.05[2] (2d ed. 1986). This rule is not altered where the magistrate made findings at a pre-trial suppression hearing, timely objections were made, and the district court made inadequate factual findings. *United States v. Lewis*, 621 F.2d 1382, 1387 (5th Cir.1980) (where district court made inadequate factual findings in affirming magistrate's recommendation on suppression issue, appellate court may make its own findings on the basis of the transcript at the suppression hearing before the magistrate), *cert. denied*, 450 U.S. 935, 101 S.Ct. 1400, 67 L.Ed.2d 370 (1981); *United States v. Berry*, 670 F.2d 583, 603 n. 25 (5th Cir. Unit B 1982) (en banc) (same). *See also United States v. Smith*, 543 F.2d 1141, 1145 (5th Cir.1976) (appellate court would make independent review of record, accepting evidence supporting the judgment where conflict exists, when district court made no findings of fact in ruling on suppression issue), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1147, 51 L.Ed.2d 564 (1977).

> 5. The statements taken from the Defendant after his arrest at the airport were obtained upon execution of waiver and consent. The statements do not suffer independent taint.
> For the foregoing reasons, the Magistrate's recommendation is REVERSED and the objections thereto are SUSTAINED. This court believes that the search of the Defendant HERNANDEZ–SALAZAR and his luggage, under the authority of 31 U.S.C. § 5317(b), was constitutionally proper on these facts.

**12.** *See supra* note 9.

**13.** Appellant does not contest the validity of his written waiver.

## I. FACTS

On May 4, 1985, United States Customs agents at the Miami International Airport decided to investigate an Avianca Airlines flight travelling from Miami to Barranquilla and Medellin, Colombia, to check for compliance with currency declaration laws.[14] United States Customs Inspector Charles Headley and another Customs agent were assigned to inspect checked baggage before the baggage was loaded on the aircraft.[15] Because the two agents had only about an hour before the flight was to depart, it would have been impossible for them to search all of the 250 to 300 bags that had been checked.

Due to the time and personnel constraints, Agent Headley utilized certain factors that, in the experience of Customs agents, indicated that a bag should be searched. Headley had been told that, in the experience of Customs agents, hard-sided luggage is often used by smugglers to conceal contraband, unlicensed high technology equipment, weapons, or currency because the bags can be equipped with false sides to offer interior concealment. Headley also had been told that bags without legible name identification tags or claim checks were suspicious. Finally, Headley had been informed that heavy bags were more likely to be false-sided suitcases, containing computers or things of that nature. As of May 4, 1985, however, Agent Headley had never personally discovered currency in checked baggage.[16]

**14.** The record indicates that Avianca's "past track record" is that the airline is used by smugglers to transport money and contraband in and out of the United States. The magistrate found that the flight was also selected because of Customs' experience that flights to South American drug-source countries are often a reciprocal route for currency or technology.

**15.** The luggage was inspected in a remote area out of the presence of any passengers.

**16.** The dissent's reliance upon the fact that Headley searched approximately 50,000 suitcases and failed to find currency in any case other than this one is misplaced. First, the dissent is incorrect in that Headley found unreported cur-

After about ten minutes of investigating the baggage, Agent Headley noticed a hard-sided American Tourister bag with a baggage claim stub but no name identification tag. Headley lifted the bag and found it to be unusually heavy. Upon discovering that the bag was locked, Headley forced the locks open with one of his pass keys. Inside the bag, Headley discovered clothing, personal belongings, and several foodstuff boxes. Headley felt the boxes but they didn't feel like they contained foodstuffs. He opened the boxes and found a large quantity of United States currency.

Agent Headley then radioed United States Customs Service Agent John Howe to inform him that Headley had discovered a large amount of United States currency in examining baggage for outgoing Avianca flight 063. Headley gave Howe the baggage claim check number for the suitcase that contained the cash.

Howe and several other agents proceeded to the gate area where Avianca flight 063 was to depart forty-five minutes later, and set up for outbound inspection of passengers. The agents placed signs in the gate area stating the currency declaration requirements for individuals transporting in excess of $10,000 in monetary instruments out of the United States.[17] One of the agents read the currency declaration requirements several times over the public address system and handed out forms detailing the requirements.[18]

When none of the passengers came forward to declare currency, Agent Howe positioned himself at the entrance to the jetway as the flight began boarding. He examined the passengers' tickets, boarding passes, and passports prior to letting them pass onto the jetway. When appellant approached and handed his documents to Agent Howe, Howe noticed that the baggage claim check attached to appellant's ticket bore the same number as the bag that Agent Headley had discovered contained a large amount of United States currency. After returning the documents and allowing appellant to pass onto the jetway, Howe pointed to United States Customs Service Inspector Robert Estrada to indicate to Estrada that appellant was the person they had been waiting for.

Inspector Estrada stopped appellant in the jetway for questioning.[19] After identifying himself, Estrada asked to see appellant's passport. When appellant produced the passport,[20] Estrada inquired as to whether appellant heard and understood the announcements regarding currency declaration requirements. Appellant said that he had heard and understood. Appellant produced a Customs leaflet describing the reporting requirements when Estrada asked if he had received a leaflet. Estrada then asked whether appellant was carrying over $10,000 in checks, negotiable bonds or instruments, or any commercial items. Appellant replied, "no, no, Inspector. I work for the airlines and I know the law." Estrada asked to see the handbag that appellant was carrying. Inside the handbag, Estrada found and opened a sealed white envelope that contained six "smurf" checks[21] totaling approximately $22,500.

At that point, Inspector Estrada formally placed appellant under arrest and gave him a *Miranda* warning. In response to questioning, appellant stated that he was not travelling with anyone else and that Hugo

---

rency in four of the bags. More important, however, is the fact that the record does not indicate what factors Headley relied upon in these other searches. Searches based upon factors other than those presented here are irrelevant to the question of whether Headley had reason to suspect a currency reporting violation *in this case.*

**17.** The signs were written in both English and Spanish.

**18.** Both the forms and the announcements were written in English and Spanish.

**19.** The entire conversation between Inspector Estrada and appellant and the subsequent *Miranda* warning was in Spanish.

**20.** Estrada noted that appellant is a Colombian national and that appellant makes frequent trips to the United States. Estrada also learned that appellant had no friends or relatives in the United States.

**21.** According to Inspector Estrada, "smurf" checks are checks in an amount less than the minimum for which the bank would have to file a form 4791.

Rios had given the money to him to transport to Colombia. The agents took appellant downstairs to the Customs office to interview him further. Later, they transported appellant to the downtown Miami Customs office for processing and further questioning.

## II. VOID FOR VAGUENESS?

Appellant attacks section 5317(b) both on its face and as applied to him. One of his primary arguments on appeal is that the district court erred in reversing the magistrate's holding that the statute, granting authority to search luggage on the basis of "reasonable cause," is void for vagueness. The magistrate found that 31 U.S.C. § 5317(a) requires a search warrant issued upon a showing of probable cause in order for agents to be able to search for monetary instruments being transported in violation of 31 U.S.C. § 5316.[22] The magistrate reasoned, however, that subsection (a) could not co-exist with subsection (b) which was added in a 1984 amendment. Subsection (b) grants authority to Customs officers to stop and search without a search warrant any "vehicle, vessel, aircraft, or other conveyance, envelope, or other container, or person entering or departing from the United States," whenever the officer has "reasonable cause to believe" that a section 5316 violation is occurring.[23] The magistrate determined that the "reasonable cause to believe" standard in subsection (b) is not defined in the statute or the legislative history. The magistrate concluded, therefore, that section 5317(b) is void for vagueness because its "irreconcilable inconsistenc[y]" with section 5317(a) does not place a reasonable person on notice of the standards by which his or her actions are governed.

Appellant contends that the statute is unconstitutional under the "second form" of the void for vagueness doctrine because it amounts to an unrestricted delegation of power to Customs officers.[24] Appellant cites no case in which the constitutional void for vagueness doctrine has been applied to a non-penal statute regulating the circumstances under which officers may conduct a search. The district court concluded that the doctrine was inapplicable because the statute in question is merely

---

**22.** 31 U.S.C. § 5317(a) provides:

The Secretary of the Treasury may apply to a court of competent jurisdiction for a search warrant when the Secretary reasonably believes a monetary instrument is being transported and a report on the instrument under section 5316 of this title has not been filed or contains a material omission or misstatement. The Secretary shall include a statement of information in support of the warrant. On a showing of probable cause, the court may issue a search warrant for a designated person or a designated or described place or physical object. This subsection does not affect the authority of the Secretary under another law.

**23.** 31 U.S.C. § 5317(b), as amended in 1984, provided:

A customs officer may stop and search, without a search warrant, a vehicle, vessel, aircraft, or other conveyance, envelope or other container, or person entering or departing from the United States with respect to which or whom the officer has reasonable cause to believe there is a monetary instrument being transported in violation of section 5316 of this title.

The 1986 amendment to § 5317(b), which eliminated the "reasonable cause" language

from the statute, is not at issue in this case because appellant's crimes and his trial occurred prior to the effective date of that amendment.

**24.** Appellant concedes that the "fair warning" rationale for the vagueness doctrine is inapplicable here because no penal statute is involved. This rationale was summarized by the Supreme Court in *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972):

[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning.

The "second form" of the vagueness doctrine upon which appellant relies was summarized by the *Grayned* Court as follows:

[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

408 U.S. at 108–09, 92 S.Ct. at 2299.

"a procedural limitation on the authority of Customs." We need not decide, however, the question of whether a statute of this type may be unconstitutional under the void for vagueness doctrine because we conclude that the statute is not vague.

■■■ We find no irreconcilable inconsistency between sections 5317(a) and 5317(b). Section 5317(a) provides a general grant of authority to all treasury agents to search anywhere for violations of section 5316.[25] This authority may not be exercised absent a showing of probable cause and a search warrant, *United States v. Chemaly*, 741 F.2d 1346 (11th Cir.1984), or a valid consent to search. *United States v. Rojas*, 671 F.2d 159, 166–67 (5th Cir. Unit B 1982).[26] In contrast, section 5317(b)'s grant of authority applies only to (1) Customs officers (2) searching "a vehicle, vessel, aircraft, or other conveyance, envelope, or other container, or person" that is (3) entering or departing from the United States.[27] A search that meets the conditions of section 5317(b) may be conducted if the Customs officer has "reasonable cause to believe there is a monetary instrument being transported in violation of Section 5316." Section 5317(b) is therefore a limited exception to the general rule provided in section 5317(a), and the two subsections do not conflict.

■■■ In addition, the use of the phrase "reasonable cause to believe" in section 5317(b) does not render the statute constitutionally void for vagueness. The district court read "reasonable cause to believe" to mean "reasonable suspicion to search." This interpretation is supported by *United States v. Arends*, 776 F.2d 262, 264 n. 1 (11th Cir.1985), where we declared in dictum that under section 5317(b), "the government must have reasonable suspicion to search individuals or objects for currency violations." The legislative history indicates that the section was clearly intended to authorize searches on the basis of less than probable cause,[28] and Supreme Court precedent suggests that "new" fourth amendment standards other than probable cause and reasonable suspicion are disfavored.[29] We conclude that the "reasonable cause to believe" requirement in section 5317(b) requires reasonable suspicion to search and that this standard is not vague.[30]

---

**25.** We note, however, that the actual violation of section 5316 necessarily occurs "at the border, if at all." *United States v. Chemaly*, 741 F.2d 1346, 1351 (11th Cir.1984).

**26.** The Eleventh Circuit, in *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), adopted as precedent decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981.

**27.** In *United States v. Arends*, 776 F.2d 262, 264 n. 1 (11th Cir.1985), this court stated in dicta that "[u]nder [section 5317(b),] the government must have reasonable suspicion to search individuals or objects for currency violations." This statement may not be taken as an indication that reasonable suspicion will be sufficient in all cases to render a search lawful. Outside of the limited confines of section 5317(b), section 5317(a) applies and probable cause and a warrant are required.

**28.** See S.Rep. No. 98–225, 98th Cong., 2d Sess. 303, *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3482, declaring that

[section 5317(b)'s] on the spot authority of the Customs Service would significantly enhance the effectiveness in monitoring and apprehending persons reasonably believed to be violating the currency reporting provisions of

the law. The Committee is fully convinced that such authority is not only needed, but constitutional, under the line of cases holding that warrantless "border searches" are reasonable even without probable cause under the Fourth Amendment.

(citing *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977); *United States v. Ajlouny*, 629 F.2d 830 (2d Cir. 1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981); *United States v. Stanley*, 545 F.2d 661 (9th Cir.1976). Although it is clear that Congress intended to allow Customs officers to search for violations of section 5316 on less than probable cause, the legislative history is ambiguous as to what standard Congress intended to adopt with the "reasonable cause to believe" language of section 5317(b).

**29.** *See United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 3310–11, 87 L.Ed.2d 381 (1985) ("We do not think that the Fourth Amendment's emphasis upon reasonableness is consistent with the creation of a third verbal standard in addition to 'reasonable suspicion' and 'probable cause'").

**30.** As the Supreme Court stated in *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985), "[t]he 'rea-

## III. APPLICATION OF SECTION 5317(b)

Having determined the correct standard by which the legality of a search under section 5317(b) must be determined, we next address whether the standard was met in this case. We first examine the legality of Agent Headley's search of appellant's luggage, and then determine whether the agents' subsequent actions in detaining appellant in the jetway and searching appellant's carry-on bag violated appellant's fourth amendment rights.

■ Agent Headley's search of appellant's checked suitcase can only be sustained if the agent reasonably suspected that appellant's suitcase was transporting undeclared currency out of the United States in violation of section 5316. Reasonable suspicion to search requires a "particularized and objective basis for suspecting" a section 5316 violation. *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

■ Although the question is admittedly close, we conclude that Agent Headley had a reasonable and articulable basis for believing that appellant's suitcase contained undeclared currency in violation of section 5316. Agent Headley relied upon three characteristics of appellant's bag in electing to search the suitcase's contents. These factors were: (1) the fact that the suitcase was hard-sided; (2) the absence of a name identification tag; and (3) the excessive weight of the bag. Each of the factors is consistent, in the experience of Customs officers, with an attempt to transport a large amount of undeclared currency

out of the United States. Although no one factor would be independently sufficient, we conclude that the presence of all three factors in this case, along with the fact that the bags were being loaded on an Avianca flight from Miami to Colombia, gave the agent sufficient reasonable suspicion to enable him to conduct a lawful search limited to confirming or dispelling the suspicions. *See United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

The search was also narrowly tailored to the circumstances that justified its initiation. Agent Headley opened appellant's bag with a pass key and inspected the contents in an area out of public view. Upon discovering the currency, he placed the suitcase back on its way to be loaded on board the aircraft. The search was therefore a limited intrusion upon appellant's privacy interests.

■ Our construction of section 5317(b)'s grant of authority to search on the basis of "reasonable cause to believe" that a section 5316 violation is occurring is consistent with congressional intent. In enacting section 5317(b) as a part of the Comprehensive Crime Control Act of 1984, Congress sought to grant special authority to Customs officers in border areas to search for currency, the "life blood of organized crime." [31] *See United States v. Arends*, 776 F.2d 262, 265 (11th Cir.1985) (Hill, J., specially concurring). If section 5317(b) is read as requiring a further basis for suspicion prior to enabling Customs officers to search a checked bag, the intent of subsection (b) would be largely defeated. Under that construction, unless currency were

---

sonable suspicion' standard has been applied in a number of contexts and effects a needed balance between private and public interests when law enforcement officials must make a limited intrusion on less than probable cause."

**31.** *See* Senate Committee on the Judiciary, Comprehensive Crime Control Act of 1983, S.Rep. No. 225, 98th Cong., 1st Sess. 300–01 ("Organized crime in the United States conceals as much as $40 billion a year in offshore countries whose banking and commercial secrecy laws prevent scrutiny. ... it is these offshore bank secrecy laws that are the glue holding criminal

operations together. ... the purpose of [Title IX of the Comprehensive Crime Control Act] is to refine and improve an important successful Federal program to inhibit the illicit drug trade and organized crime."); *Certain Tariff and Trade Bills: Hearings Before the Subcommittee on Trade of the House of Representatives Committee on Ways and Means*, 96th Cong., 2d Sess. 279 (1980) (statement of Congressman Stark) ("There was a fear that currency departing the country for Swiss bank accounts was aiding and abetting organized crime").

protruding from checked luggage, it is difficult to conceive of a situation where Customs officers would have sufficient suspicion to conduct a lawful search of a checked bag without some independent contact with the bag's owner or an informant's "tip." We believe that such independent contact was not intended to be essential in all cases in order for a Customs officer to have reasonable suspicion to search.[32]

■ The subsequent detention of appellant in the jetway and search of his carry-on bag were also supported by the statute. Customs agents knew that the claim check attached to appellant's ticket bore the same number as the claim check attached to the suitcase containing in excess of $200,000 in United States currency. Agents also knew that appellant had not declared this currency despite a variety of announcements explaining the requirements. When appellant stepped onto the jetway preparing to board the plane, he had "unequivocally manifested an intention to leave the United States."

*United States v. Rojas*, 671 F.2d 159, 163 (5th Cir. Unit B 1982). It follows from our analysis in *Rojas* that the subsequent stop of appellant and search of his bag was supported by reasonable suspicion:

> At the time of the stop [on the jetway], Customs agents had information from a reliable informant that Rojas was carrying $1,000,000 in cash, and the agents knew that she had twice denied this and had refused to fill out a reporting form. These facts constituted reasonable suspicion meriting further investigation.

*Id.* at 164–65.[33]

■ Even if appellant's detention on the jetway rose to the level of an arrest,[34] our analysis in *Rojas* leads to the conclusion that appellant committed the section 5316 violation at the time he entered the jetway. When appellant insisted that he was not transporting in excess of $10,000 in undeclared currency, "[c]ustoms agents in effect witnessed the crime and hence had probable cause to arrest" appellant. *Id.* at

---

**32.** In introducing the bill containing what is now section 5317(b), the bill's author, Congressman LaFalce, stated that one of the purposes of the bill is to "allow U.S. Customs officials to search for currency in the course of their presently authorized search for contraband articles." 125 Cong.Rec. 33699 (1979). 19 U.S.C. § 482 grants authority for Customs searches of "any trunk or envelope, wherever found, in which [a Customs officer] may have a reasonable cause to suspect there is merchandise which was imported contrary to law." Although the language of § 5317(b) negates any inference that it, like § 482, is limited to searches for currency reporting violations on *incoming* persons or instrumentalities, the statement of purpose indicates that § 482 can provide some guidance as to the level of suspicion required for a lawful search under § 5317(b).

The Supreme Court construed § 482 in *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), to allow searches of incoming international mail. In *Ramsey*, the Court upheld the actions of Customs agents in opening eight envelopes that appeared to have been typed on the same typewriter. The Customs officer in *Ramsey* relied upon: (1) the fact that the letters were from Thailand, a known source of narcotics; (2) the fact that the letters "felt bulky;" and (3) the fact that the letters all weighed more than the average weight of an airmail letter. The Court found that these factors were sufficient to constitute "reasonable cause to suspect" illegal importation and that this application was constitutional.

*Ramsey* was foreshadowed by the former Fifth Circuit's decision in *United States v. King*, 517 F.2d 350 (5th Cir.1975). Appellant King had been receiving approximately 18 to 20 Christmas card size envelopes per week at his post office box in Birmingham. The envelopes had six different sender names but the same overseas return address. Ten envelopes were opened because they were "thicker than an ordinary Christmas card," and a "cushion of powdery material" inside the envelope was created when they were tapped. The court concluded that Customs had sufficient "reasonable cause" to search under § 482. *See also United States v. Doe*, 472 F.2d 982 (2d Cir.1973) (Customs agent had reasonable cause to search package labeled "old clothes" because, in his experience, packages allegedly containing old clothes often contain dutiable new clothes).

**33.** *Rojas* was decided prior to the enactment of § 5317(b). We concluded in *Rojas* that even though Rojas's detention rose to the level of an arrest, the agents had probable cause to support their actions and the subsequent searches were supported by valid consent. We therefore affirmed Rojas's conviction by traditional search and seizure analysis without deciding the border search questions.

**34.** In light of our conclusion that probable cause existed, we need not determine the precise time at which the encounter became an arrest.

165. We conclude, therefore, that the agents' actions in this case were consistent with section 5317(b) and that the search and seizure was lawful unless section 5317(b) is unconstitutional.

## IV. CONSISTENCY WITH THE FOURTH AMENDMENT

It is well established that the fourth amendment constrains the power of Congress to authorize searches and seizures. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973); *United States v. Villamonte-Marquez*, 462 U.S. 579, 585, 103 S.Ct. 2573, 2578, 77 L.Ed.2d 22 (1983). The Supreme Court has stated that a "cardinal principle" of the fourth amendment is that: "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to a few specifically established and well-delineated exceptions." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982); *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).[35] "[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." *Mincey*, 437 U.S. at 393, 98 S.Ct. at 2414.

It is also established that appellant had a reasonable expectation of privacy in his checked luggage. As we stated in *United States v. Goldstein*, 635 F.2d 356, 361 (5th Cir. Unit B 1981), "when airport security is not involved, every passenger who has luggage checked with an airline enjoys a reasonable expectation of privacy that the contents of that luggage will not be exposed in

the absence of consent or a legally obtained warrant." (emphasis omitted).[36] Our conclusion in *Goldstein* is supported by *Torres v. Commonwealth of Puerto Rico*, 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979). In *Torres*, the appellant took a non-stop flight from Miami to San Juan, Puerto Rico. Upon arriving in Puerto Rico, local police searched Torres's luggage without probable cause or a warrant. The Supreme Court held that the search violated Torres's fourth amendment rights. Chief Justice Burger wrote for the court:

> The search of appellant's baggage ... did not satisfy the requirements of the Fourth Amendment as we have heretofore construed it. First, the grounds for a search must satisfy objective standards which ensure that the invasion of personal privacy is justified by legitimate governmental interests. The governmental interests to be served in the detection or prevention of crime are subject to traditional standards of probable cause to believe that incriminating evidence will be found. Second, a warrant is normally a prerequisite to a search unless exigent circumstances make compliance with this requirement impossible.

442 U.S. at 471, 99 S.Ct. at 2429–30 (citations omitted).

Section 5317(b) authorizes luggage searches without consent, a warrant, probable cause, any risk to airport security, or exigent circumstances. The government apparently concedes that, unless the "border search exception" to the fourth amendment applies, the measure violates the fourth amendment.

The Supreme Court has discussed the scope of the "border search exception" in the context of *incoming* persons and property.[37] The Court has indicated that the

---

**35.** *But see* Bradley, *Two Models of the Fourth Amendment*, 83 Mich.L.Rev. 1468, 1473–74 (1985) ("In fact, these exceptions [to the fourth amendment] are neither few nor well-delineated. There are over twenty exceptions to the probable cause or the warrant requirement or both.").

**36.** *See also New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985) ("[S]earches of closed items of personal luggage

are intrusions on protected privacy interests, for 'the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view.' ").

**37.** *See, e.g., United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); *United States v. Villamonte-Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983); *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United*

"border search exception" is based upon the sovereign's authority to protect itself by examining incoming persons and property.[38] The Court has not, however, decided any case involving searches of *outgoing* persons and property.[39] We decline to construe the Court's general statements of the border search rationale so narrowly as to foreclose the proposition at issue here.

In several prior decisions, this Circuit has reserved the question of whether the border exception extends to *departing* persons and instrumentalities. *See United States v. Arends,* 776 F.2d 262, 264 n. 2 (11th Cir.1985); *United States v. Chemaly,* 741 F.2d 1346, 1351 (11th Cir.1984); *United States v. Rojas,* 671 F.2d 159, 164 (5th Cir. Unit B 1982). However, the time has come to determine whether Congress may, con-

sistent with the fourth amendment, authorize warrantless searches of persons and property[40] departing from the United States on the basis of reasonable suspicion to search.

Every circuit[41] that has considered the question has ruled that the rationales for the "border exception" apply both to incoming and outgoing persons and instrumentalities. *See United States v. Swarovski,* 592 F.2d 131 (2d Cir.1979); *United States v. Ajlouny,* 629 F.2d 830 (2d Cir.1980); *United States v. Udofot,* 711 F.2d 831 (8th Cir.), *cert. denied,* 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983); *United States v. Stanley,* 545 F.2d 661 (9th Cir.1976); *United States v. Duncan,* 693 F.2d 971 (9th Cir. 1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983). The Ninth

---

States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

**38.** The most extensive exposition of the rationale for the border exception was in *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). In *Ramsey,* the Court declared that "the border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." 431 U.S. at 620, 97 S.Ct. at 1980. The Court quoted from *Ramsey* in *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), but used somewhat broader language to describe the border exception:

Balanced against the sovereign's interests at the border are the Fourth Amendment rights of respondent.... But not only is the expectation of privacy less at the border than in the interior, but [sic] the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is struck much more favorably to the Government at the border.

105 S.Ct. at 3310 (citations omitted).

**39.** The government points to *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 63, 94 S.Ct. 1494, 1518, 39 L.Ed.2d 812 (1974), as supporting its view that the "border exception" applies to both incoming and outgoing persons and instrumentalities. In *Shultz,* the Court stated in dictum that "[i]f reporting of income may be required as an aid to enforcement of the federal revenue statutes, and if those entering *and leaving* the country may be examined as to their belongings and effects, all without violating the Fourth Amendment, we see no reason to invalidate the

Secretary's regulations here." (emphasis added).

We conclude that the language in *Shultz* was not intended to resolve the unsettled question presented in this case. Immediately prior to the above-quoted statement, the *Shultz* Court quoted from Chief Justice Taft's opinion for the Court in *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925), indicating that "[t]ravellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one *entering the country* to identify himself as entitled to come in, and his belongings as effects which may be lawfully *brought in.*" (emphasis added). We do, however, find that *Shultz* supports our view that the Court's prior cases discussing the border search exception strictly in terms of those entering the country should not be read as excluding the possibility that the fourth amendment might allow warrantless searches of departing persons and property on the basis of reasonable suspicion.

**40.** Our decision is limited to the constitutional validity of § 5317(b). We do not decide whether all aspects of what has been developed as within the "border exception" rationale applies to both incoming and outgoing persons.

**41.** Although the Ninth Circuit adheres to the view that the border exception applies to both incoming and departing persons and instrumentalities, see *United States v. Stanley,* 545 F.2d 661 (9th Cir.1976); *United States v. Duncan,* 693 F.2d 971 (9th Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983), some members of that court have expressed disagreement. *See United States v. Des Jardins,* 747 F.2d 499 (9th Cir.1984), *rehearing,* 772 F.2d 578 (1985).

Circuit, in *Stanley*, summarized the rationale for its holding as follows:

> [B]oth incoming and outgoing border-crossing searches have several features in common: (1) the government is interested in protecting some interest of United States citizens, such as restriction of illicit international drug trade, (2) there is a likelihood of smuggling attempts at the border, (3) there is difficulty in detecting drug smuggling, (4) the individual is on notice that his privacy may be invaded when he crosses the border, and (5) he will be searched only because of his membership in a morally neutral class.

545 F.2d at 667.

 Although we need not decide here whether the "border exception" applies equally in all respects to incoming and outgoing searches at the border, we conclude that Congress may, consistent with the fourth amendment, authorize Customs officers to conduct warrantless searches of persons and property departing the United States on the basis of reasonable suspicion that a currency reporting violation is occurring. The permissibility of a particular law enforcement practice is judged by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985) (quoting *United States v. Villamonte-Marquez*, 462 U.S.

579, 588, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22 (1983)).

The governmental interest in stemming the flow of unreported currency out of the United States is substantial.[42] Large amounts of undeclared currency departing the United States bear an obvious relationship to the "veritable national crisis in law enforcement"[43] caused by smuggling of illicit narcotics and money laundering schemes often associated with organized crime.[44] The "long-standing right of the sovereign to protect itself"[45] that underlies the traditional rationale for the border search exception is implicated to a substantial degree where the international borders of the United States are penetrated by large sums of undeclared currency departing this country.

Balanced against this governmental interest is the fourth amendment rights of individuals to be free from unreasonable searches and seizures. The statute grants authority for only a limited exception to the fourth amendment warrant and probable cause requirements for a search. Section 5317(b) allows Customs officers to search for section 5316 violations only where reasonable suspicion to search is present; thus searches for section 5316 violations on less than reasonable suspicion remain unlawful. *See United States v. Chemaly*, 741 F.2d 1346 (11th Cir.1984).

An individual's expectation of privacy is also less at international borders. *United*

---

**42.** *See United States v. Naranja*, 645 F.Supp. 154 (S.D.Fla.1986).

**43.** *See United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985). In *United States v. Turner*, 639 F.Supp. 982 (E.D.N.Y.1986), the court described the extent of the problem to which § 5317(b) is directed:

> The scope of the profits that results from drug trafficking is truly amazing and indeed startling. Back in 1979 there were estimates that the revenues produced were on the order of $50 billion.... Despite the strenuous efforts of our federal law enforcement agencies, the Court has heard estimates that equal or exceed the present budget deficit and there is no doubt that the illicit cash flow is at present much greater than it was in 1979.
>
> Moreover, there can be no question that in order to be successful in the struggle against

drug traffickers, we must attempt to reach their illegal profits. The 4790 Forms gathered by the Customs Service are a vital tool in this effort.... Part of the problem in the past has been the fact that efforts to enforce the currency reporting requirements have been lax. Congress was made aware that at many United States airports persons transporting illegal drug profits were subject to little scrutiny upon leaving the United States....

> It is against this background that efforts were made to expand the search authority of the Customs Service

> ....

**44.** *See* S.Rep. No. 225, *supra* note 28, at 300.

**45.** *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977).

*States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 3310, 87 L.Ed.2d 381 (1985). Although an individual may have a more substantial expectation of privacy when departing the country than when entering, individuals attempting to depart from the United States are on notice that they may be questioned and searched. Finally, the fourth amendment balance between the interests of the government and the privacy right of the individual is struck much more favorably to the government at the border. *Id.*

Balancing these considerations leads us to conclude that section 5317(b) does not authorize unreasonable searches and seizures. Finding that the statute is constitutional both on its face and as applied to appellant, we AFFIRM appellant's convictions.

HATCHETT, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the statute is constitutional on its face and that reasonable suspicion is the proper standard.

Section 5317(b) of 31 U.S.C. required the customs officer to have reasonable suspicion that this particular suitcase contained a monetary instrument being transported in violation of 31 U.S.C. § 5316.

A Customs officer may stop and search, without a search warrant, a vehicle, vessel, aircraft, or other conveyance, envelope or other container, person entering or departing from the United States *with respect to which* or whom the officer has reasonable cause to believe there is a *monetary instrument* being transported in violation of section 5516 of this title.

31 U.S.C. § 5317(b).

On the facts of this case, no reasonable suspicion existed that the suitcase in this case contained a monetary instrument. This case presents nothing more than the application of a profile. The customs officer's profile described all unusually heavy hard-sided suitcases without name tag checked on Avianca Airlines flights to Colombia. If reasonable suspicion existed for the search of this suitcase, then reasonable

suspicion will exist for the search of every hard-sided suitcase without a name tag checked on Avianca Airlines.

The customs officer testified that between February and July 1985, he opened about 50,000 suitcases without finding currency, except in the suitcase in this case. For sure, some of these 50,000 suitcases were searched after the May 4, 1985, search in this case. Nevertheless, this proves either that the profile is too general to raise a reasonable suspicion that a given suitcase meeting the profile contains unreported cash, or the customs officers are simply opening suitcases without any indicators suggesting suspicion. If whatever is being used leads to the correct conclusion only one out of 50,000 times, it is too unreliable to support a finding of reasonable suspicion.

The majority states that Agent Headley "utilized *certain factors that, in the experience of Customs agents, indicated that a bag should be searched.*" In its simplest form, that is exactly what a profile is. The Constitution does not allow Customs officers or any other law enforcement officers to decide beforehand that certain indicators shall always give them the right to search. They may not search every suitcase because it has a hard cover; they may not search every suitcase because it is to be placed aboard a certain airline; surely, they may not search every suitcase because it is to be transported to a certain country. For this and other good reasons, the Eleventh Circuit has until this case uniformly condemned searches based on profiles designed by law enforcement officers and have demanded that "reasonable suspicion" exist to search a person or thing targeted by law enforcement officers.

It is important to remember that the statute under which the customs officer acted in this case authorizes searches for monetary instruments, not heavy weapons or computers. Consequently, the magistrate found: the weight of the bag could not have been an important factor.

It is equally important to remember that this case does not involve what persons or things may be searched upon *entry into*

*the United States.* Rather, it concerns the search of things legally within the United States, but leaving the country. The question is what type searches United States citizens and others will be subjected to as they leave the country. Our Constitution does not allow searches of persons or things except when supported by "probable cause." Because we treat border searches in a special manner, we today uphold a statute that reduces the constitutional standard from "probable cause" to "reasonable suspicion." Congress acted reasonably, I agree the statute is *on its face* constitutional. The problem is: If the statute can be applied as the majority applies it in this case, the congressional effort and intent is nullified, because *as applied* in this case the statute is unconstitutional.

I would reverse.