**UNITED STATES, Appellee,**

v.

**Francisco A. BERAS, Defendant, Appellant.**

No. 98–1787.

United States Court of Appeals, First Circuit.

Submitted May 7, 1999.

Decided July 7, 1999.

Julio E. Gil De Lamadrid, Jose Neil Peña Senati, and Marisel Peña Senati on brief for appellant.

Camille Vélez–Rivé, Assistant United States Attorney, Jorge E. Vega–Pacheco, Assistant United States Attorney, and Guillermo Gil, United States Attorney, on brief for appellee.

Before STAHL, Circuit Judge, KRAVITCH,* Senior Circuit Judge, and LIPEZ, Circuit Judge.

STAHL, Circuit Judge.

Defendant-appellant Francisco A. Beras was convicted by a jury for failing to report that he was transporting over $10,000 in currency out of the United States in violation of 18 U.S.C. § 2 and 31 U.S.C. §§ 5316(a)(1)(A) & 5322, and for making a false statement in violation of 18 U.S.C. §§ 2 & 1001. The district court sentenced Beras to twelve months' imprisonment and also ordered him to forfeit the $138,794 that he was transporting. On appeal, Beras challenges his convictions, the court's sentence, and its forfeiture order. After careful consideration of Beras's arguments, we affirm his convictions and the sentence, but reverse the forfeiture order and remand for further proceedings consistent with this opinion.

## I.

### Background

In reviewing the court's denial of defendant's motion to suppress, we recite the facts as found by the district court to the extent they are not clearly erroneous. *See United States v. McCarthy*, 77 F.3d 522, 525 (1st Cir.1996). On May 24, 1997, Beras and co-defendant Carmen Ortiz were stopped at the jetway in the Luis Munoz Marin International Airport in Carolina, Puerto Rico by United States Customs Agent Victor Ramos as they were attempting to board a flight destined for Santo Domingo, Dominican Republic. Ramos asked Beras and Ortiz for an interview and the two acquiesced. Ramos then identified himself as a customs officer and explained that passengers transporting more than $10,000 in currency are required to file a report. Both Beras and Ortiz indicated that they understood the requirement. Ramos asked whether either of them was carrying more than $10,000. Each an-

swered no. Ramos next asked how much currency each passenger was transporting. Ortiz stated that she was transporting $3,000 and Beras stated that he was transporting $2,500. Ramos asked Ortiz to show him the currency she was transporting, and Ortiz produced an envelope that appeared to contain about $3,000. Ramos asked Beras to show him the currency that he was transporting, and Beras opened his wallet, showing cash totaling about $5,000.

During the interview, Ramos noticed a bulky area in the lower part of each passenger's legs. Ramos called a female agent and asked her to pat down Ortiz. The pat down revealed bundles of cash hidden inside each of Ortiz's socks. Ramos conducted a pat down of Beras and felt a bulge in Beras's lower leg. Ramos asked Beras to show him the contents of the bulge. Beras lifted up both his pant legs and removed money that he was carrying in his socks. Ramos placed Beras and Ortiz under arrest and escorted them to the Customs inspection area where the two were subsequently searched. The search revealed $138,794 in cash.

On June 11, 1997, a grand jury returned a three-count indictment against Beras and Ortiz. Count One charged that Beras and Ortiz had aided and abetted each other and were about to transport monetary instruments in excess of $10,000 from Puerto Rico to the Dominican Republic, without first filing a report. *See* 18 U.S.C. § 2 and 31 U.S.C. §§ 5316(a)(1)(A) & 5322. Count Two sought criminal forfeiture of the $138,794. *See* 18 U.S.C. § 982. Count Three charged Beras and Ortiz with aiding and abetting each other while making a false statement as to a material fact, *see* 18 U.S.C. §§ 2 & 1001, when defendants stated that they were carrying less than $10,000. Before trial, Ortiz pleaded guilty as to Count One and the government dismissed the other charges against her.

Beras moved to suppress the evidence that was obtained as a result of his ex-

* Of the Eleventh Circuit, sitting by designation.

change with Ramos, alleging that it was obtained in violation of his Fourth Amendment rights. Following a hearing, a magistrate judge issued a Report and Recommendation that the motion be denied under the border search exception to the Fourth Amendment. In the alternative, the magistrate found that the pat down of Beras's legs was supported by reasonable suspicion. The district court adopted the magistrate's Report and Recommendation and denied the suppression motion.

A jury trial began on February 10, 1998. During trial, Beras objected to the government's introduction into evidence of a blank United States Customs form 4790 and two posters, arguing that they had not been disclosed to him during discovery and therefore were inadmissible at trial.[1] The court overruled Beras's motion with respect to the customs form but granted the motion with respect to the posters. After a two-day trial, the jury returned a guilty verdict as to Counts One and Three.

Following the trial, the government moved for an order of forfeiture pursuant to Count Two of the indictment. The court granted the motion, ordering that Beras and Ortiz forfeit $138,794 as property used by them during the commission of the crime alleged in Count One of the indictment.

On May 26, 1998, the district court, after a hearing, sentenced Beras to twelve months and one day of imprisonment, three years of supervised release, and imposed a special fine of $100.

On appeal, Beras claims (1) that the district court erred in denying his motion to suppress; (2) abused its discretion in admitting evidence that had not been produced during discovery; (3) made a number of errors in calculating his sentence;

and (4) that the forfeiture order violates the Eighth Amendment.

## II.

### Discussion

A. Motion to Suppress

■ In his challenge to the district court's denial of his motion to suppress, Beras contends that the exchange between him and Ramos constituted a *de facto* arrest that was not supported by probable cause. We review the court's findings of fact for clear error and review *de novo* its conclusions of law and its rulings on the constitutionality of the government's conduct. *See United States v. Acosta–Colon*, 157 F.3d 9, 13–14 (1st Cir.1998).

■ There is no question that Ramos's initial questioning of Beras did not infringe Beras's Fourth Amendment rights. *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual ... in [a] public place, by asking him if he is willing to answer some questions, by putting questions to him ... or by offering in evidence in a criminal prosecution his voluntary answers to such questions.") (plurality opinion). Thus, the issue is whether Ramos was permitted to pat down Beras's legs. The government contends that the pat down was a routine border search that falls within the border search exception to the Fourth Amendment.

■ It is well established that "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). Under the border

---

1. The form and posters stated that passengers transporting over $10,000 in currency are required to file a report. The form was introduced as evidence of the reporting requirements. The two posters were introduced to show that Beras, who had made numerous trips back and forth from the Dominican Republic, had knowledge of the reporting requirement.

search exception, "[r]outine searches of the persons and effects of *entrants* are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *Id.* (emphasis added). The Supreme Court, however, has not yet addressed the issue of whether the border search exception applies to outgoing as well as incoming travelers. Nor has this circuit ruled on the issue. *But see Acosta–Colon,* 157 F.3d at 13 (suggesting, in *dicta,* that the border search exception would apply if "the bags or any of the suspects were required to pass through U.S. Customs, or were involved in any international border crossing"). Every other circuit to consider the issue, to our knowledge, has held that the border search exception applies to outgoing as well as incoming travelers.[2] *See United States v. Ezeiruaku,* 936 F.2d 136, 143 (3d Cir.1991); *United States v. Berisha,* 925 F.2d 791, 795 (5th Cir.1991); *United States v. Udofot,* 711 F.2d 831, 839–40 (8th Cir.1983); *United States v. Ajlouny,* 629 F.2d 830, 834–35 (2d Cir. 1980); *United States v. Stanley,* 545 F.2d 661, 667 (9th Cir.1976); *cf. United States v. Hernandez–Salazar,* 813 F.2d 1126, 1138 (11th Cir.1987) (without deciding whether the border search exception "applies equally in all respects to incoming and outgoing searches," holding that the Fourth Amendment "permits warrantless searches of persons and property departing the United States on the basis of reasonable suspicion that a currency reporting violation is occurring"). These cases have drawn support from *dicta* in *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 63, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), where the Supreme Court stated: "[T]hose entering and leaving the country may be examined as to their belongings and effects, all without violating the Fourth Amendment."

■ We join our sister circuits and conclude that the border search exception to the Fourth Amendment applies to outgoing travelers. In our view, there is a convincing policy justification for extending the exception. The border search exception arises from the "longstanding concern for the protection of the integrity of the border[, ... a] concern [that] is, if anything, heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics." *Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. 3304. As the Third Circuit has recognized, this concern also arises with respect to outgoing travelers:

> National interests in the flow of currency justify the diminished recognition of privacy inherent in crossing into and out of the borders of the United States.... Although there is not the slightest suggestion that the appellee here was implicated in drug trafficking, in an environment that sees a massive importation of drugs across our borders, we are cognizant that there must be a concomitant outflow of cash to pay for this nefarious traffic.

*Ezeiruaku,* 936 F.2d at 143.

Beras was patted down at the functional equivalent of an international border, *see Almeida–Sanchez v. United States,* 413 U.S. 266, 272–73, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), and the district court supportably found that the pat down was conducted pursuant to a routine border search. Thus, neither probable cause nor reasonable suspicion was required. The district court's denial of the motion to suppress is affirmed.

**B. Evidentiary Issues**

■■ Beras complains that the district court erred in admitting into evidence a blank United States Customs Form 4790, which passengers leaving or entering the country must file when they are transport-

---

2. Furthermore, Congress has provided that persons departing the country may be searched at the border without probable cause or reasonable suspicion. *See* 31 U.S.C. § 5317(b).

ing more than $10,000 in currency.[3] Beras contends that because the form was not disclosed to him during discovery, it should not have been admitted at trial. *See* Fed. R.Crim.P. 16.

Rule 16(a)(1)(C) requires that the government, upon request of the defendant, permit the defendant to inspect and copy any document that the government intends to use as evidence in its case in chief at trial. Where the government fails to comply with this rule, the district court "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Fed.R.Crim.P. 16(d)(2). We review the district court's ruling for abuse of discretion. *See United States v. Tajeddini*, 996 F.2d 1278, 1287 (1st Cir. 1993). We will uphold the ruling absent a demonstration of prejudice to the defendant. *See id.* Moreover, a "criminal defendant must ordinarily seek a continuance if he intends to claim prejudice." *United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir.1993). "[I]n situations where defense counsel does not seek a continuance upon belated receipt of discoverable information, a court often can assume that counsel did not need more time to incorporate the information into the defense's game plan." *Id.*

Even assuming *arguendo* that the government violated Rule 16, Beras failed to request a continuance. Beras also has failed to articulate any prejudice suffered as a result of the government's failure to produce the form during discovery. We therefore detect no reversible error in the district court's decision to admit the form into evidence.

## C. Sentencing on Counts One and Three

Beras assigns two errors to the district court's calculation of his sentence under the Sentencing Guidelines. We review the court's factual determinations for clear error and its interpretation of the Sentencing Guidelines *de novo. See United States v. Conley*, 156 F.3d 78, 84 (1st Cir.1998).

First, Beras claims that the district court erred in applying a seven-point enhancement pursuant to U.S.S.G. § 2F1.1(b)(1)(h), which states that such an enhancement is appropriate for a "loss" that exceeds $120,000. According to Beras, because there was no "loss" in his crime, the seven-point enhancement is inappropriate. Beras's argument is without merit. The district court properly referred to U.S.S.G. § 2S1.3, which provides the base offense level for the "Failure to File Currency and Monetary Instrument Report." The base offense level is "6 plus the number of offense levels from the table in § 2F1.1 ... corresponding to the value of the funds." The district court thus properly enhanced Beras's sentence by seven points because the "value of the funds" exceeded $120,000.[4]

Second, Beras claims that the district court erred in failing to award him a two-point reduction in his base offense level for his acceptance of responsibility. *See*

3. Beras's objection to the court's admission of the two posters was sustained by the district court. *See supra* note 1. Nevertheless, Beras complains that the district court improperly permitted Ramos to testify generally as to the contents of the posters. On appeal, Beras contends that Ramos's testimony was inadmissible hearsay. He failed, however, to note his objection during trial and therefore has waived this argument. *See United States v. Mateo–Sanchez*, 166 F.3d 413, 418 (1st Cir.),

*cert. denied,* —— U.S. ——, 119 S.Ct. 2060, 144 L.Ed.2d 225 (1999).

4. Beras also seems to contend that because he was personally carrying only $75,000, the seven-point enhancement was inappropriate. Beras's claim is totally without merit. There is no dispute that Beras and Ortiz together were transporting $138,794, and that the entire amount belonged to Beras. Thus, the "value of the funds" involved in Beras's crimes exceeded $120,000.

U.S.S.G. § 3E1.1. According to Beras, he deserved a reduction because he only went to trial to avoid forfeiture and has expressed remorse. Recognizing that "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility," U.S.S.G. § 3E1.1, Application Note 5, we defer to the court's finding that "[Beras] went to trial in order to contest the factual elements of the offenses for which he was charged and the statement of remorse included in the PSI was made by him after his conviction." We find no error in the court's decision not to award Beras an acceptance of responsibility reduction.

### D. Eighth Amendment Claim

■ Finally, Beras claims that the district court's forfeiture order violates the Eighth Amendment's prohibition of excessive fines. Because Beras did not raise the Eighth Amendment claim at trial, we review only for plain error. See Fed. R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). Under Rule 52(b), we may take notice of a forfeited claim of error only if there has been (1) an error; (2) that is "plain," meaning "clear" or "obvious"; and (3) that error "affect[s] substantial rights". United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); see also United States v. Bradstreet, 135 F.3d 46, 50 (1st Cir.), cert. denied, —— U.S. ——, 118 S.Ct. 1805, 140 L.Ed.2d 944 (1998). Even if these three elements are met, however, we may not exercise our discretion unless the error involves "a miscarriage of justice" or "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 736, 113 S.Ct. 1770.

First, there is no doubt that the forfeiture order would be an error if Beras's trial occurred today. The Supreme Court has held that the forfeiture of $357,144 that a defendant willfully failed to report as he was exiting the country would violate the Excessive Fines Clause of the Eighth Amendment. See United States v. Bajakajian, 524 U.S. 321, 118 S.Ct. 2028, 2031, 141 L.Ed.2d 314 (1998). The Court stated that full forfeiture would be "grossly disproportional to the gravity of his offense," given that the defendant was found guilty only of a reporting offense. Id. at 2031, 2038., 118 S.Ct. 2028 Because this case was still pending on direct review when Bajakajian was decided, there was error under Bajakajian. See Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (A "new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases . . . pending on direct review. . . .").

Second, despite the fact that Bajakajian was decided after the district court's decision in Beras's case, the error was plain. The Supreme Court has stated that "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration." Johnson v. United States, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

Third, we think it clear that the error affects Beras's substantial rights: his punishment is significantly greater than it otherwise would have been. An Eighth Amendment right not to be subjected to excessive fines is a core constitutional right that we deem substantial.

We thus must decide whether failing to correct this "plain error" would cause "a miscarriage of justice" or would "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 736, 113 S.Ct. 1770. Although we have typically exercised our discretion to correct plain errors when an innocent person is convicted and sentenced, "we have never held that a Rule 52(b) remedy is only warranted in cases of actual innocence." United States v. Marder, 48 F.3d 564, 571 (1st Cir.1995) (quoting Olano, 507 U.S. at 736, 113 S.Ct. 1770). Indeed, we have previously found an ex-

cessive restitution order to constitute a miscarriage of justice warranting correction. *See United States v. Gilberg*, 75 F.3d 15, 22 (1st Cir.1996). We similarly find that a forfeiture order that is so excessive as to violate the Eighth Amendment would constitute a miscarriage of justice. We therefore exercise our discretion to find plain error under the circumstances of this case.

On remand, the district court is directed to consider the analysis laid out in *Bajakajian* in setting a forfeiture order that is not grossly disproportional to the gravity of Beras's offense. The court may consider: (1) that Beras's violation was not related to any other illegal activities; (2) other penalties that Congress has authorized for Beras's crimes as well as the maximum penalty provided by the Sentencing Guidelines;[5] and (3) the extent of the harm caused by Beras's actions. *See Bajakajian*, 118 S.Ct. at 2036, 2038–39; *3814 N.W. Thurman St.*, 164 F.3d at 1197–98.

court for action consistent with this opinion on Count Two.

## III.

### Conclusion

Accordingly, we *affirm* defendant's convictions and sentences with respect to Counts One and Three. We *vacate* the forfeiture order and *remand* to the district

---

**5.** Here, the maximum fine authorized by Congress is $250,000, while the maximum fine authorized by the Sentencing Guidelines is $30,000. *See* 31 U.S.C. § 5322(a); U.S.S.G. § 5E1.2. *Bajakajian*, however, suggests that the maximum penalties provided under the Guidelines should be given greater weight than the statute because the Guidelines take into consideration the culpability of the individual defendant. *See Bajakajian*, 118 S.Ct. at 2038 n. 14; *United States v. 3814 N.W. Thurman St.*, 164 F.3d 1191, 1197 (9th Cir. 1999). Moreover, neither the statute nor the Guidelines can "override the constitutional requirement of proportionality review." *Bajakajian*, 118 S.Ct. at 2038 n. 14.