**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Carlos NATES, Defendant-Appellant.**

**No. 86–5247.**

United States Court of Appeals, Ninth Circuit.

Submitted Aug. 4, 1987.[*]

Decided Oct. 30, 1987.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Duane J. Deskins and Carolyn J. Kubota, Los Angeles, Cal., for plaintiff-appellee.

Joseph T. Vodnoy, Los Angeles, Cal., for defendant-appellant.

Before WIGGINS, KOZINSKI and O'SCANNLAIN, Circuit Judges.

WIGGINS, Circuit Judge:

Following the district court's denial of his motion to suppress evidence, Carlos Nates entered a conditional guilty plea under Fed.R.Crim.P. 11(a)(2) to one count of making a false statement to a government agency in violation of 18 U.S.C. § 1001 and one count of failing to report transporting currency in violation of 31 U.S.C. § 5316(a)(1)(A). The court sentenced him to eighteen months imprisonment. Nates appeals his conviction and sentence on the grounds that: (1) 31 U.S.C. § 5317(b) (Supp. III 1985) [hereinafter § 5317(b)] (current version at 31 U.S.C.A. § 5317(b) (West Supp.1987)) violates the fourth amendment of the Constitution by authorizing unreasonable searches and seizures; and (2) the district court erred in finding the customs officer had reasonable cause to search his luggage under § 5317(b). We affirm.

## FACTS

United States customs agent Ausalon Miramontes was on duty at Los Angeles International Airport on April 29, 1986 visually inspecting baggage checked onto Avianca Airlines flight 81 bound for Bogota, Colombia. He was seeking to discover baggage carrying large amounts of undeclared currency from the United States. Miramontes selected Nates' two bags for inspection because they were new (one still bearing a price tag), had no passenger name tag, and were unusually heavy. He opened the bag with the price tag, discovered $2,000 in a towelettes container, and noticed a portable electric organ smelling strongly of glue. Alerted customs agents stopped Nates as he was about to board flight 81, matched his baggage claim number to the baggage Miramontes inspected, and explained the currency reporting law to him in English and Spanish. Nates reported that he was not transporting more than $2,000 out of the country. The agents brought Nates to the customs office where he claimed the suitcases. In Nates' presence Miramontes continued to search the baggage. He removed the rear panel of the electric organ and discovered $105,000. The agents also found $2,769 in Nates' possession for a total sum of $109,769.

Nates moved to suppress the evidence on the grounds that the search violated § 5317(b) and the fourth amendment. The district court denied the motion ruling that the customs agents had reasonable suspicion to inspect the luggage as required under § 5317(b).

## DISCUSSION

### I. Constitutionality of § 5317(b)

■ Nates claims that § 5317(b) is unconstitutional because travelers who are leaving the United States may not be searched without a search warrant or probable cause. This is a question of law, which we review de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Miramontes searched Nates' luggage under authority of § 5317(b) which stated at the time:

> A customs officer may stop and search, without a search warrant, a vehicle, vessel, aircraft, or other conveyance, envelope or other container, or person entering or departing from the United States with respect to which or whom the officer has reasonable cause to believe there is a monetary instrument being transported in violation of section 5316 of this title.

Section 5316 requires persons transporting more than $10,000 in currency into or outside of the United States to report the currency to customs officials. Although the Ninth Circuit has not expressly addressed the constitutionality of § 5317(b), prior precedent effectively forecloses the issue. The border search exception to the fourth amendment, which allows a search to be initiated without a warrant, probable cause or articulable suspicion, applies to exit searches. *United States v. Whiting*, 781 F.2d 692, 695 (9th Cir.1986); *United States v. Cardona*, 769 F.2d 625, 628 (9th Cir.1985); *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983); *accord United States v. Udofot*, 711 F.2d 831, 839–40 (8th Cir.), *cert. denied*, 464 U.S. 896, 104 S.Ct. 245, 78

L.Ed.2d 234 (1983); *United States v. Ajlouny*, 629 F.2d 830, 833–34 (2d Cir. 1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981). The rule has been criticized in dissent, *Duncan*, 693 F.2d at 983–84 (Fletcher, J. dissenting), and in dicta, *United States v. Des Jardins*, 747 F.2d 499, 503–04 (9th Cir.1984), *modified in part on other grounds*, 772 F.2d 578 (1985), but has not been overruled. This circuit holds that a suspicionless exit border search is constitutional. *A fortiori*, § 5317(b), requiring reasonable cause, is also constitutional.

### II. Reasonable Cause

■ The government does not argue that it could search Nates' luggage for unreported currency under the border search exception. It conceded below that the statute's "reasonable cause to believe" standard applies. Reasonable cause is a mixed question of law and fact, reviewed de novo. *United States v. Kerr*, 817 F.2d 1384, 1386 (9th Cir.1987); *United States v. Most*, 789 F.2d 1411, 1415 (9th Cir.1986).

The government contends the customs agent had reasonable cause to believe that Nates' luggage contained unreported currency before he initiated his search. It claims five factors satisfy the requirement: the bags were destined for Bogota, Colombia, a known source-country for narcotics; Avianca Airlines flight 81 is a flight often used by currency smugglers; the bags had no name identification tags; the bags were brand new and unusually heavy. The district court found that the agent did not select all bags, nor select them randomly. It also found that the agent used credible professional judgment based on an evaluation of objective criteria, i.e. weight and appearance of bags, before selecting any particular bag to search. The court concluded that the agent had reasonable cause.

The Supreme Court has not construed the "reasonable cause to believe" standard of § 5317(b). It has construed another statute that mandates a "reasonable cause to suspect" standard in regulating customs searches, 19 U.S.C. § 482, which provides

in part: "Any [customs agent] may ... search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law...." In *United States v. Ramsey*, 431 U.S. 606, 614, 97 S.Ct. 1972, 1977, 52 L.Ed.2d 617 (1977), the Court ruled the customs agent had "reasonable 'cause to suspect'" that there was contraband in a letter under § 482 because it came from Thailand, was bulky and weighed more than a normal letter. Though slightly different (reasonable cause to suspect rather than reasonable cause to believe), the similar phraseology and similar context (customs searches of international mail) justify analogizing to § 5317(b). *See United States v. Hernandez-Salazar*, 813 F.2d 1126, 1135 n. 32 (11th Cir.1987) (one purpose of § 5317(b) is to allow search for currency in course of search for contraband under § 482, therefore § 482 can provide guidance on level of suspicion required under § 5317(b)).

This circuit has equated the "reasonable cause to suspect" standard under § 482 with "reasonable suspicion", and has defined the test as one milder than that of "probable cause". *Most*, 789 F.2d at 1415. "To justify a search under § 482 on the basis of reasonable suspicion, an official must be aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the package contains illegal material." *Id.* In *Most*, the customs agent had reasonable cause to open a mailed package because it came from a source country, the label described a cheap article, and it weighed more than expected. *Id.* at 1416; *see also United States v. Dubrofsky*, 581 F.2d 208, 211 (9th Cir.1978) (" '[r]easonable cause to suspect' is a considerably milder standard than probable cause" and it is

reasonable to suspect that a crated container imported from Thailand contains narcotics). Thus, the Supreme Court and this circuit have held that external characteristics of a container from a suspect country, alone, are sufficient to establish reasonable cause under § 482.

The Eleventh Circuit has analyzed § 5317(b)'s reasonable cause standard when applied to an inspection of luggage. In *Hernandez-Salazar*, 813 F.2d at 1134, the court concluded that the agent's search of luggage [1] under a reasonable suspicion standard was justified because the suitcase was destined for Colombia on Avianca Airlines, was hard-sided, had no name identification tag, and was unusually heavy. The reasons cited by the government for using those factors were that: Avianca's track record indicated use by currency smugglers, hard-sided luggage could often be equipped with false sides, heavy bags were more likely to have false-sides, and bags without name tags were suspicious. *Id.* at 1130 & 1130 n. 14.

The factors used in *Hernandez-Salazar* are similar to those in Nates' case; the luggage was bound for Columbia on Avianca airlines, it was new, heavy, and without name tags. We find the customs agent had reasonable cause to inspect Nates' luggage. The § 482 cases and *Hernandez-Salazar* provide sufficiently analogous precedent.[2]

## CONCLUSION

Section 5317(b) is constitutional. The customs agent had reasonable cause to inspect Nates' baggage, therefore we affirm.

KOZINSKI, Circuit Judge, dissenting.

The court correctly applies the law of the circuit pertaining to border searches and I

---

1. The search was conducted, as in this case, outside the presence of any passengers. *Hernandez-Salazar*, 813 F.2d at 1130 n. 15.

2. Moreover, Congress has indicated by its latest amendment that it does not want more stringent standards applied to exit searches of persons or luggage than can now be conducted by customs agents in any other context under the border search exception. The current version of the statute states:

**Searches at border.**—For purposes of ensuring compliance with the requirements of section 5316, a customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, any envelope or other container, and any person entering or departing from the United States.

31 U.S.C.A. § 5317(b) (West Supp.1987).

therefore reluctantly join its opinion.[1] However, the court stops short in failing to consider the reasonableness of the search, a necessary further inquiry when defendant has challenged the search on fourth amendment grounds.[2] Although 31 U.S.C. § 5317(b) (Supp. III 1985) authorized the government to search Nates' luggage without a warrant or probable cause, the statute did not and could not exempt the search from the one irreducible requirement of the fourth amendment, the requirement of reasonableness. *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985); *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374 (1931); *United States v. Cardona*, 769 F.2d 625, 629 (9th Cir.1985); *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir.1982); *United States v. Guadalupe–Garza*, 421 F.2d 876, 878 (9th Cir.1970). The record here raises very serious doubts about whether the search was reasonable. I would therefore reverse or, at the very least, remand for the district court to consider the issue.

## Introduction

What I find intensely disquieting about this case is the thorough, widespread and intrusive search that culminated in Nates' arrest. Pursuant to official policy, customs agents inspecting the luggage on Avianca flight no. 81 selected a number of suitcases they thought looked suspicious and, using passkeys, opened the suitcases and searched through them. These searches were conducted outside the presence of the passengers and without their knowledge or consent.

Nates' suitcase contained an unusually large amount of currency, which led the officers to confront Nates and, eventually, arrest him. We therefore know a good deal about this particular search. What we don't know much about are the searches conducted of other people's luggage, except that the number of other bags opened and searched at that time was probably on the order of two dozen.[3] We also don't know precisely how many suitcases are opened and searched every day without the knowledge or consent of their owners, but the number appears to be very substantial. In a case recently decided by the Eleventh Circuit, the record disclosed that in a seven-month period during 1985, *a single customs agent* surreptitiously "opened about 50,000 suitcases." *United States v. Hernandez-Salazar*, 813 F.2d 1126, 1130 n. 16 (11th Cir.1987); *id.* at 1139 (Hatchett, J., dissenting). If this rate is typical, it would amount to about 100,000 bags opened per agent per year. Assuming that the customs service assigns even a modest number of agents to this task, the number of surreptitious intrusions into the property and privacy of travelers is potentially staggering. It is a matter that should give us serious pause lest we overlook, and implicitly approve, what may amount to wholesale violations of the fourth amendment rights of the traveling public.

## Discussion

### I.

There is no precise formula for what constitutes a reasonable search under the fourth amendment. The Constitution strikes a delicate balance between the state's legitimate interest in detecting and preventing criminal activity and the individ-

1. My reluctance is based largely on the misgivings expressed in *United States v. Des Jardins*, 747 F.2d 499, 503–04 (9th Cir.1984).

2. My colleagues' failure to address the issue is understandable given that defendant did not raise this precise argument here or below. Nevertheless, defendant objected to the search on fourth amendment grounds; this makes the issue one we may (but admittedly need not) address. Our responsibility to defendant, and to the traveling public—the true victim of the search here—militates in favor of considering the issue.

3. At the suppression hearing, agent Miramontes testified that he searched the luggage for Avianca flight no. 81 on April 29, 1986, together with three other officers. He himself examined about twelve pieces of luggage, of which he opened six. Reporter's Transcript at 18–22. He was not aware of how many bags his colleagues opened but, presumably, the number was somewhat similar.

ual's right to property, privacy and dignity. As the Supreme Court has often noted:

> [W]hat is reasonable depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires "balancing the need to search against the invasion which the search entails." *Camara v. Municipal Court,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967). On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order.

*T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 741.

A secret search is, perhaps, the hardest to justify in light of our shared notions of individual privacy and personal autonomy. Clandestine searches are, by and large, foreign to our way of thinking because of their inherent intrusiveness, the heightened risk of abuse they pose, and because they are inconsistent with principles of openness and fair play we normally expect of our public officials. The notion that, while an individual is temporarily separated from his property, law enforcement officers are rummaging through it at will, is difficult to square with contemporary notions of what is reasonable governmental conduct.

Because secret searches are so unusual in our national experience, there is little law on the subject. But such law as there is reflects our discomfort with such procedures. For example, the infamous writs of assistance of the eighteenth century, universally decried as infringements on personal liberties, nonetheless "required that notice be given before entry was made...." 2 W. LaFave, *Search and Seizure* § 4.8(a), at 271 (2d ed. 1987) (quoting Note, *Announcement in Police Entries,* 80 Yale L.J. 139, 145 (1970)). More recently, the federal wiretap statute, 18 U.S.C. § 2510 et seq., and the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 et seq., allow secret intrusions into our privacy only with great reluctance, for the most compelling reasons and subject to the closest judicial scrutiny.[4] While these statutes have no direct application here, I believe they fairly reflect our collective discomfort with surreptitious governmental intrusions into our privacy.

## II.

### A.

There are three aspects of the search here in question that, alone or in combination, render it unreasonable under the fourth amendment. *First,* the search was conducted without notice and therefore the passengers on Avianca flight no. 81 were "not given a reasonable opportunity to surrender their privacy voluntarily." 2 W. LaFave, *supra,* § 4.8(d)–(f), at 278 (2d ed. 1987) ("LaFave"). The requirement that notice be given before a search is conducted is of ancient origin[5] and has become deeply rooted in our jurisprudence.[6]

---

**4.** The Foreign Intelligence Surveillance Act, for example, provides that the President, through the Attorney General, may authorize wiretaps without a court order in limited circumstances involving foreign communications. 50 U.S.C. § 1802(a)(1) (1982 & Supp. III 1985). In addition, the Attorney General may authorize wiretaps for a set time if he simultaneously gives notice to the specially-constituted court. *Id.* at § 1805(e). Otherwise, wiretaps must be approved by that court in advance, *id.* § 1803, and only upon a proper showing of necessity and subject to appropriate minimization procedures designed to protect the privacy of innocent third parties whose conversations are overheard by authorized surveillance. *Id.* §§ 1801(h), 1804–06. Moreover, even if the surveillance is authorized by the court, a person aggrieved by the wiretap may challenge it in a United States district court. *See United States v. Ott,* 827 F.2d 473, 476 (9th Cir.1987).

**5.** In all cases where the King is a party, the sheriff (if the doors be not open) may break the party's house, ... if otherwise he cannot enter. But before he breaks it, he ought to signify the cause of his coming, and to make request to open the doors....
*Semayne's Case,* 5 Coke 91a, 91b, 77 Eng.Rep. 185, 186–87 (K.B. 1603).

**6.** In *Sabbath v. United States,* 391 U.S. 585, 590, 88 S.Ct. 1755, 1758, 20 L.Ed.2d 828 (1968), a case which involved an interpretation of the federal notice statute, 18 U.S.C. § 3109, the Court noted the "values inherent in" the notice requirement, values that center around the individual's interest in privacy and security from government intru-

While a search conducted without notice may nonetheless be proper, notice clearly bears on the question of reasonableness. *See, e.g., United States v. Valenzuela*, 596 F.2d 824, 830 (9th Cir.), *cert. denied, sub nom., Lizarraga v. United States*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979). In *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), for example, the Court struck down a state eavesdropping statute on the grounds, inter alia, that it "has no requirement for notice ... nor does it overcome this defect by requiring some showing of special facts." *Id.* at 60, 87 S.Ct. at 1884. If there is no persuasive justification for failing to give notice, such failure can itself render the search unreasonable. *See generally* 2 W. LaFave, *supra*, § 4.8(d)–(f), at 280–87 (2d ed. 1987).

Here, there is no indication that signs were posted or that passengers were otherwise advised that agents would be rummaging through their personal possessions.[7] Moreover, because, as Judge Norris noted in *Des Jardins*, "exit searches are quite uncommon" in the United States, 747 F.2d at 504, passengers have no expectation or common understanding that they may suffer a fairly serious intrusion into their privacy as a condition for leaving the country. Indeed, given the above-board procedure employed in entry searches, where passengers are required to line up with their luggage for spot-checks by customs agents, travelers can reasonably infer from the absence of such procedure that no exit checks are conducted. My guess is that most passengers would be shocked to learn that, as they are waiting to board the plane, faceless bureaucrats are breaking into their luggage and pawing through it at will.

I suppose it is possible that there were good reasons for searching the luggage on Avianca flight no. 81 without notice to the passengers. But any such reason would have to be carefully documented and would probably only be valid as to that flight. I rather doubt that the policy of secret searches can be justified in the abstract to cover all passengers on all flights leaving the United States. In any event, justification there would have to be; I don't think that the practice of searching luggage without notice is so inherently reasonable that we could approve it without justification.

*Second*, the search was conducted outside the passengers' presence. This infringes a variety of privacy and property interests. Luggage is the little bit of home we take with us when we travel. As the Supreme Court has noted,

> searches of closed items of personal luggage are intrusions on protected privacy interests, for "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *United States v. Ross*, 456 U.S. 798, 822–823, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982).

*T.L.O.*, 469 U.S. at 337, 105 S.Ct. at 741. In a very real sense, luggage is as private—and as vulnerable to intrusion—as is our place of abode. *See United States v. Chadwick*, 433 U.S. 1, 11, 13, 97 S.Ct. 2476, 2483, 2484–85, 53 L.Ed.2d 538 (1977); *cf. Arkansas v. Sanders*, 442 U.S. 753, 764, 99 S.Ct. 2586, 2593, 61 L.Ed.2d 235 (1979). Passengers often carry with them "such ... highly personal items as photographs, letters, and diaries," *T.L.O.*, 469 U.S. at 339, 105 S.Ct. at 742, that they would be uncomfortable to have others gawk at. If the search is conducted in the passengers' presence, they may be able to cover up or partially conceal such items to avoid unwarranted scrutiny. When the search is conducted in secret, the passengers have no way of avoiding unjustified examination of private items that may become the butt

---

sion. *See also Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *Munoz v. United States*, 325 F.2d 23 (9th Cir.1963). *See generally* 2 W. LaFave, *Search & Seizure*, § 4.8(b), at 273–77 (2d ed. 1987).

7. While the record is not entirely clear on this point, the absence of notice can be inferred from the fact that Nates was not aware that his luggage had been searched when he was confronted by the customs agents. If there is a doubt on this point, it could easily be resolved on remand.

of jokes or allusions by the personnel conducting the search.

On a more mundane level, when the search is conducted outside the passengers' presence, they are unable to protect the physical security or integrity of their possessions. Thus, bags might be damaged when they are forced open, or their contents might be broken, lost or stolen. When passengers are present during the search, they can minimize the risk by opening suitcases themselves and alerting the agents about any items that may be subject to damage. Also, they can witness any mishap and hold the agent responsible. Agents, for their part, may be more careful if passengers are watching. While we trust our federal agents to be careful and honest, we also know that perfection is rare to find and difficult to maintain. The fact of the matter is, when agents secretly break into people's suitcases and search through them by the hundreds of thousands, occasionally something will go wrong—someone will be tempted, or careless, or even do something that seems perfectly reasonable yet causes damage, such as opening a canister of undeveloped film.

*Finally,* there is a separate intrusion because passengers whose luggage is searched are generally never told about it. This means that when something is lost, stolen, mislaid or broken, the passenger will be completely mystified as to what happened. He will have no idea where to inquire as to its whereabouts or demand compensation. He may spend countless hours looking for the item in places he might have left it, harassing people who might have taken it, never suspecting that a government agent used a passkey to go through his luggage. Being subject to a secret search and then never being told about it is something I think most people would find especially offensive, and this then bears on the reasonableness of the procedure employed by the government.

**8.** This would no doubt prevent customs agents from trapping suspects into false statements, as they did here. But I am not convinced that putting suspects in a position where they are

### B.

All of this might be beside the point if there were no reasonably available alternatives. But there clearly are. For one thing, there is no apparent reason why passengers cannot be advised that their luggage may or will be searched before it leaves the country. Customs agents put up signs and make public announcements advising passengers of their duty to report currency over $5,000. The same methods could be employed to advise passengers that government agents might be searching through their luggage before it is put on the plane. Alternatively, agents might first inspect the luggage and identify pieces that look suspicious. Passengers could then be reunited with their luggage and given an opportunity to open the suitcases for inspection.[8] Finally, if it turns out that the search must be conducted secretly, there is no self-evident reason why passengers whose luggage has been searched cannot be advised of the fact afterward and given a chance to make sure everything is in order.

One simple way of handling the matter would be for passengers to exit the country through customs—with occasional spot checks—much as they do when entering. A number of other countries have routine exit checks and, while somewhat intrusive, they certainly seem like a straightforward and effective way of implementing the congressional mandate embodied in 31 U.S.C. § 5317(b).

To be sure, from the point of view of law enforcement authorities, such a procedure may have disadvantages. But the same can be said of the Bill of Rights. As Justice Black noted,

> [t]he concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a

likely to commit a separate offense is a governmental interest that ought to carry much weight with us in determining reasonableness.

written Constitution and undermine the basis of our Government.

*Reid v. Covert,* 354 U.S. 1, 14, 77 S.Ct. 1222, 1229, 1 L.Ed.2d 1148 (1957) (plurality opinion). The relevant question is not whether law enforcement officers have selected the best available method but whether alternatives are available that more equitably balance the interests of law enforcement with the individual rights of citizens. *Cf. Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) ("the investigative methods employed should be the least intrusive means reasonably available"). If reasonable alternatives are available, that alone renders the government's actions unreasonable and therefore unconstitutional.[9]

One final consideration. The alternatives I have suggested would give exit searches far more visibility than they now receive. This would expose the practice to the political process, an important safeguard against arbitrary government action. I, for one, would feel far more comfortable with the procedure here employed if I were convinced that the public was aware of it and generally approved. It may be that the government's reluctance to advise passengers of these searches is motivated in part by a fear that, if widely known, the practice would not be tolerated. I am reluctant to help the government maintain this secret.

### Conclusion

Many decisions of this court and the Supreme Court have given force to Justice Brandeis' declaration in *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), that the framers of the

Constitution "conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Id.* at 478, 48 S.Ct. at 572 (Brandeis, J., dissenting). "To protect that right," declared Brandeis, "every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment." *Id.* This fundamental principle is of no less force when it is the individual's personal luggage that is at issue. For it is clear that the individual's realm of privacy includes his possessions as well as his person, his duffle bag as well as his dwelling. *See, e.g., Chadwick,* 433 U.S. at 11, 13, 97 S.Ct. at 2483, 2484–85.

The search here did not comport with these principles. I must therefore respectfully dissent.

---

**9.** The Supreme Court's opinion in *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), does not render the search here per se constitutional. Justice Powell expressed the limited precedental effect of the majority opinion: "On the understanding that the precedental effect of today's decision does not go beyond the validity of mail searches at the border pursuant to the statute, I ... join the opinion of the Court." *Id.* 431 U.S. at 625, 97 S.Ct. at 1983. *Ramsey* deals with materials coming *into* the country, a point emphasized repeatedly by the Court. *Id.* at 612, 616, 619, 620, 623, 97 S.Ct. at 1976, 1978–79, 1980, 1980–

81, 1982. The fact bears heavily on people's expectation that the materials will be subject to search. Moreover, *Ramsey* involved a search (but not reading) of the contents of envelopes. The likelihood of intrusion is far less where one is dealing with the nonwritten contents of an envelope then with the contents of a suitcase. Finally, in *Ramsey* there were no reasonably available alternatives. Upon entering the country, the mail was searched at the General Post Office in New York City, far from its ultimate destination. *Id.* at 609 n. 2, 97 S.Ct. at 1975 n. 2. Obtaining the consent or participation of the addressee would have been quite burdensome.