**UNITED STATES of America**

v.

**Scott E. OBIUWEVBI.**

**No. 89 CR 1062.**

United States District Court,
N.D. Illinois, E.D.

April 10, 1991.

Sean Martin, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Stephen J. Broussard, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

### I. Introduction

Mr. Obiuwevbi was convicted of violating 18 U.S.C. § 1001.[1] Verdict was entered on July 26, 1990. Initially, the Government had charged Obiuwevbi with one count of making false statements to a Federal Officer in violation of 18 U.S.C. § 1001, and with one count of failure to file a currency report form in violation of 31 U.S.C. § 5316.[2] However, the Government filed a superseding indictment which dropped the count for the violation of the currency reporting requirement. Defendant was convicted of making a false statement to a Customs inspector. Now, Obiuwevbi makes the rather untimely motion for this

---

**1.** 18 U.S.C. § 1001 reads in pertinent part:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies ... a material fact, or makes any false ... statements ... knowing the same to contain any false ... statements ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**2.** Title 31, U.S.C. § 5316 states in pertinent part:

(a) [A] person ... shall file a report under subsection (b) of this section when the person ... knowingly—

(1) transports, is about to transport, or has transported, monetary instruments of more than 4 10,000 at one time—

(A) from a place in the United States to or through a place outside the United States; or

(B) to a place in the United States from or through a place outside the United States ...

(b) A report under this section shall be filed at the time and place the Secretary of the Treasury prescribes. The report shall contain the following information ...

(1) the legal capacity in which the person filing the report is acting.

(2) the origin, destination, and route of the monetary instruments.

(3) when the monetary instruments are not legally and beneficially owned by the person transporting the instruments, or if the person transporting the instruments personally is not going to use them, the identity of the person that gave the instruments to the person transporting them, the identity of the person who is to receive them, or both.

(4) the amount and kind of monetary instruments transported.

(5) additional information....

31 U.S.C.A. § 5316 (1983 West and 1990 West Supp.)

court to grant him a new trial on the grounds that he was selected for questioning by the Customs inspector solely because he was black. He also contends that the evidence obtained by the Customs inspector should be suppressed under the Fourth Amendment exclusionary rule. For the following reasons, this court denies defendant's motion for a new trial and allows the conviction to stand.

## II. Finding of Facts
### A. Arrest and Conviction

On December 12, 1989 a Customs inspector approached the defendant at O'Hare International Airport while he was attempting to board Royal Dutch Airlines Flight KLM No. 612 destined for Amsterdam, Holland, and outbound continuing on to Lagos, Nigeria. The Customs Inspector, Robert Personnett, had observed Mr. Obiuwevbi standing in the front of the line of passengers waiting to board the plane. Inspector Personnett noticed that when he stared at Obiuwevbi, the defendant stared back at him. Inspector Personnett also noticed that Obiuwevbi looked concerned, and nervous. Obiuwevbi continued to stare at Inspector Personnett who was in full uniform at the time. The Inspector then approached the defendant and asked him if he was aware of the currency reporting requirements for passengers leaving the United States. The defendant stated that he was aware of the requirements for inbound passengers but was not aware of such a requirement for outbound passengers. The defendant's passport, however, indicated that he had been to Nigeria and back to Chicago numerous times in the previous few years. Presumably, Obiuwevbi would have been made aware of the reporting requirements during those trips. Additionally, in the KLM No. 612 departure area there were approximately five signs posted informing departing passengers of the reporting requirements.

Inspector Personnett informed the defendant that outbound passengers must declare currency in excess of $10,000 to Customs officials, and that failure to do so could result in criminal penalties. Obiu-

wevbi acknowledged that he then understood the requirement. Inspector Personnett proceeded to question the defendant as to how much money he had with him. Obiuwevbi replied that he only had about $3,000 in his possession. However, the defendant also said that he was carrying some more money for other persons. The inspector then asked him how much he had with him in total, and Obiuwevbi declared that he had a total of $6,000 to $7,000. At that time Inspector Personnett began to search the defendant's carry on luggage and found $6,100 in envelopes (mostly in $100 bills). He then asked Obiuwevbi if he was wearing anything around his waist, like a moneybelt. Obiuwevbi said that he was not. A pat down search, however, revealed $17,750 (mostly $100 bills contained in open bank envelopes) in a secret pouch sewn into the waist lining of the defendant's pants. Another $640 was found in Obiuwevbi's wallet. In total, the defendant was attempting to leave the United States with $24,500 in unreported U.S. currency.

At the initial grand jury investigation, the prosecutor presented the testimony of Ernest Magana, the Customs Department agent assigned to the case. After the prosecutor had begun to lay out the facts of the case to the grand jury through Agent Magana's testimony, several grand jurors interrupted with numerous questions. The grand jurors asked why Inspector Personnett had approached the defendant. Agent Magana replied that the inspector's choice of the defendant was a random one. Magana informed the Grand Jury that flight routes to places like Nigeria are chosen because those countries have established histories of drug trafficking and money laundering violations. Tr. of January 10, 1990 Grand Jury presentation at 4–5.

### B. Post–Conviction Hearing

After verdict was entered against the defendant on July 26, 1990, Obiuwevbi moved that he should be allowed a new trial on the grounds that the Customs inspector selected him for interrogation solely on the basis of his race. The defendant's counsel argued this point vigorously

and stated that he would present witnesses whose testimony would show that the United States Customs Department had a policy or custom of interrogating black persons leaving and coming into the country solely on the basis of their race. This court subsequently entertained defendant's post conviction motion. The witnesses which defendant presented, however, did not establish a custom or policy of racially motivated interrogations. The testimony elicited from the Government on the other hand, demonstrated that the Customs officials were not stopping persons for interrogation solely because they were black. The Government's testimony established the existence of a severe money laundering problem out of the United States and of drug transport back into the country by Nigerians. Moreover, the Government demonstrated that Nigerians are stopped, interrogated, and searched at airports only when they fit "courier profiles". These profiles are based on a variety of data, such as international intelligence reports and first hand experience by Customs Inspectors. From the profiles the Customs officials are able to stop and search persons based on a reasonable suspicion—a suspicion which is based on various relevant facts pertaining to the profile and not one founded simply on the race of the individual to be interrogated.

At the post-conviction hearing, Mary McCarthy, U.S. Customs Department Supervisor of the Interdiction for Narcotics and Outboard Enforcement Program testified on behalf of the Government, regarding the manner in which Customs Inspectors collect information to establish courier profiles. Ms. McCarthy has worked with the Customs Department for nineteen years and has been a supervisor for two-and-a-half-years. Principally, she is the coordinator for the Customs Department's "Operation Buck Stop".

During "Operation Buck Stop", Customs agents target certain flights for interrogation of passengers who might be attempting to take money out of the country without declaring amounts over the statutory allowance. There are approximately twenty-five international flights a day, four of which are targets of Operation Buck Stop. All airlines and all cites of destination are at some time targeted for an investigation. Customs agents target all flights to make sure that what they believe to be "low risk flights" in fact remain low risk flights.

Flight routes which are low risk are those which have destinations to vacation spots such as the Barbados or Bermuda. Places such as these are frequented by vacationers that do not usually carry more than ten-thousand dollars in cash. After targeting one of these "low risk" flights, the Customs agents "get a feel" for the type of passengers who fly the route. If there are no currency reporting violations on these targeted flights then the Customs agent would determine that the flight is still a low risk route.

Some of these low risk routes have changed to become high risk routes. For example, the Customs Department found out that there was a trend developing in which many Polish persons who worked in the United States were returning to Poland with a lot of unreported cash, often with more than the amount allowed by statute. Ms. McCarthy also stated that drug smuggling routes coming into the United States might also change. She indicated that unless low risk routes are periodically checked, routes where there was previously no smuggling might become smuggling routes.

Ms. McCarthy identified cities throughout the world that have been found to be source and transshipment routes for narcotics. "Source sites" would be those cities or countries where narcotics originate or are grown, while "transshipment sites" are cities where narcotics are held or stored until carried to their final destinations. She identified several countries in Africa— as well as countries in Central Asia and Europe—as source and transshipment sites. In Africa, Nigeria and Ghana were identified as transshipment sites while the Ivory Coast and Benne were identified as "staging" areas. Kenya was identified as a producer of heroin.

The Customs Department obtains this information from U.S. Customs seizure report analyses and from international intelligence reports. The international intelligence reports are from a number of sources, such as: customs services worldwide, the Customs Cooperation Counsel, "Interpoll Reports", "Epic Reports", and other named intelligence reports. These intelligence reports contain data such as the destination and nationalities of persons who have been arrested as drug couriers. Race, however, has never been one of the characteristics listed in these reports. Similarly, the United States Customs Seizure Reports and various analyses compile the following characteristics in their courier profiles: name, nationality, port where the courier entered, country, type of drug seized, concealment method, quantities and purities, actual purity level, and destination of violation. As one can see, race is not a consideration in either the U.S. Customs Seizure Reports or in the international intelligence reports.

Ms. McCarthy testified that the Customs Department also relies upon secondary source reports in developing courier profiles. These secondary sources are oftentimes simply newspaper or magazine articles which are given to the Customs Department by passengers. The U.S. Attorney tendered "Government Exhibit Articles", which contained a series of magazine articles about Nigerian drug transporting. The first article was from a magazine called *Newswatch*, published by the Nigerian government. Significantly, the article expressed the Nigerian government's concern that the drug trade is so widespread in west Africa that the country may now be a consumptive area in addition to already being a transporter of narcotics to other destinations. The next article tendered in the exhibit was from the *Bangkok Post*, and it also discussed drug transporting by Nige-

rians. Ms. McCarthy then read an article from *The Guardian*, another Nigerian magazine, which was written by a Nigerian doctor commissioned by the Nigerian government to do a study on the Nigerian drug problem. These secondary sources contained in "Government Exhibit Articles" demonstrated a serious drug trade and consumption problem by Nigerian people on an international level.

Ms. McCarthy then described the process of how the Customs Department decides when to interrogate a person about to leave the United States for another country. She said that a KLM flight from the United States to Amsterdam, like the one which the defendant was scheduled to take when he was arrested, often has passengers aboard destined for several different countries. Many of their final destinations are to high risk transfer or source points. She said that if confronted with a situation in which there were eight black men all going to Lagos, she would *not* stop all of those black men. Ms. McCarthy said that since there are several other high risk destination points that are flight routes from Amsterdam, Holland Customs officials would miss money launderers and potential couriers going to other high risk destinations if they were to search persons solely because they were blacks traveling to Lagos. Indeed, the drug trade is a world problem in which the Government cannot afford to limit its attack to any one nation or people.[3]

Ms. McCarthy then revealed a series of statistics which demonstrated a staggering growth in Nigerian drug and money laundering offenses. First, she related statistics compiled by the U.S. Customs Department of Nigerians who were arrested while attempting to bring heroin into the United States. In 1988, thirty-six (36) Nigerians were arrested; in 1989, two-hundred-seventeen (217) Nigerians were arrested; in 1990

---

**3.** I then posed a hypothetical: I said what if a flight bound for Amsterdam was late or in a hurry to leave the United States and it was supposed to be subjected to Operation Buck Stop. How would the Customs agents decide whom to interrogate? Ms. McCarthy said that the agents would quickly have to use their observation skills to determine which persons fit

the drug courier/money launderer "profile". As stated above, a profile is determined from all of the various customs seizure analysis and worldwide custom analysis mentioned, as well as the agent's own experience in interrogating persons who have been found out to be couriers or drug smugglers.

three-hundred-fifteen (315) Nigerians were arrested; and for 1991 from January to mid-March, fifty-two (52) have been arrested for attempting to transport heroin into this country. Second, she detailed how many Nigerians were arrested for currency reporting violations leaving the United States: in 1988, forty-two (42) Nigerians were arrested: in 1989, seventy (70) Nigerians were arrested; in 1990, one-hundred-sixty (160) Nigerians were arrested; and in the first two and half months of 1991 there have been thirty-five (35) Nigerians arrested for currency violations.

Finally, Ms. McCarthy gave statistics for the percentage of dollars seized from Nigerians for currency violations in relation to the total amount of money seized in all currency violations throughout the United States: in 1988, out of five million dollars seized, over one million of that was seized from Nigerians destined for Nigeria; in 1989 twenty-two million dollars were seized in total, and one and a half million of that was seized from Nigerians destined for Nigeria; in 1990, for the first quarter of the year, ten million dollars was seized of which four point eight (4.8) million were seized from Nigerians destined for Nigeria.

### III. Discussion of the Law

The Supreme Court has stated that the purpose of the proscriptions of the Fourth Amendment is to impose a standard of "reasonableness" upon the exercise of discretion by government officials. *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1978). A standard of reasonableness must be imposed upon government officials, including law enforcement agents, so that the privacy and security of individuals will be secure from arbitrary invasions. *Prouse, supra*, at 654, 99 S.Ct. at 1396 (citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978)). Accordingly, the Supreme Court has maintained that the permissibility of a particular law enforcement practice should be judged by balancing its intrusion on the individual's Fourth Amendment rights against its promotion of legitimate governmental interests. Thus, the reasonableness standard requires that the facts upon which an intrusion is based must be measured against an objective standard; whether it be probable cause or some less stringent test.

In *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968) the Supreme Court held that police should be allowed to stop and briefly detain a person for investigating purposes if the officer has a *reasonable suspicion* supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1988) (emphasis added). Under this "reasonable suspicion" standard, the officer must be able to articulate something more than an "inchoate and unparticularized suspicion or hunch." *Sokolow, supra* at 7, 109 S.Ct. at 1585 (quoting *Terry, supra*, 392 U.S. at 27, 88 S.Ct. at 1883). Accordingly, for a reasonable suspicion to exist the totality of the circumstances must be considered. *Sokolow, supra*, 490 U.S. at 8, 109 S.Ct. at 1585. In *Sokolow*, the Supreme Court stated that in determining whether reasonable suspicion exists in a drug search and seizure case, a court must require the Government agent to articulate the factors which lead to his decision to conduct a search. Moreover, the Court said that the fact that such criteria might be set forth in a courier profile does not "somehow detract from their evidentiary significance as seen by a trained agent." *Sokolow, supra.*

The Government in this case contends that authority for the search of Obiuwevbi is contained in 31 U.S.C. § 5317(b), which provides that:

**(b)** [A] customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, only envelope or other container, and any person entering or departing from the United States.

**(c)** If a report required under section 5316 with respect to any monetary instrument is not filed ... the instrument and any interest in property ... traceable to such instrument may be seized and

forfeited to the United States Government. . . .

31 U.S.C. § 5317(b)–(c) (West Supp.1990). As amended in 1986, section 5317(b) omitted a previous requirement that Customs agents have "reasonable cause" to believe that currency violations are present before conducting a stop and search. Apparently, the statute now authorizes routine "border stops" to the full extent allowed by the Constitution. *U.S. v. Benevento,* 836 F.2d 60, 69, n. 1 (2nd Cir.1987) and *U.S. v. Hernandez–Salazar,* 813 F.2d 1126, 1133 (11th Cir.1987).[4]

The legislative history of 31 U.S.C. § 5317(b) indicates that the section was clearly intended to authorize searches on the basis of less than probable cause. *Hernandez–Salazar, supra* at 1133 (citations omitted).[5] Moreover, there is nothing in the legislative history which indicates that Congress intended an exclusionary remedy for violations of the statute. *U.S. v. Benevento,* 836 F.2d 60, 69–70 (9th Cir.1987) *cert. denied* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620. At the same time, courts have also stated that searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border. *United States v. Charleus,* 871 F.2d 265, 267 (2d Cir.1989) (quoting *United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977)). The border search exception has been held to apply to searches of persons leaving the country. *U.S. v. Nates,* 831 F.2d 860, 862 (9th Cir. 1987) (citations omitted); *California Bank-*

ers *Ass'n v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *Julian v. United States,* 463 U.S. 1308, 103 S.Ct. 3522, 77 L.Ed.2d 1290 (1983).

At the post-trial hearing on Obiuwevbi's motion, his counsel called several persons to testify as to the existence of a Customs or policy of harassment by Customs Agents of Nigerians arriving and departing from the United States to Nigeria. That testimony has not led this court to believe that Customs Officials are engaging in any policy of harassment against Nigerians on the basis of their race. The court believes that the Government has clearly demonstrated that there is indeed a history of drug transport by Nigerians travelling to the United States from Nigeria and a history of money laundering by Nigerians leaving the United States for Nigeria. Such a history would justify a search based upon a standard less that probable cause. I do not believe that the Government is free in these situations to search people solely because of their race. However, since the testimony offered by the Government clearly demonstrates that not to be the case, and since the testimony elicited by the witnesses of the defendant does not show otherwise, the court finds that the Government's search was not improper. Therefore, the court finds no credence to the defendant's assertion that the Government was simply "harassing" these Nigerians and the defendant because the Government has a racial prejudice against Nigerians, blacks, or persons of African descent.

From the testimony at the trial and the post-conviction hearing, this court cannot

**4.** This is in line with the Supreme Court's rationale for border searches set forth in *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 63, 94 S.Ct. 1494, 1518, 39 L.Ed.2d 812 (1974), in which the court said that "those entering and leaving the country may be examined as to their belongings and effects, all without violating the Fourth Amendment." *Also see United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977), in which the Supreme Court held that border searches do not require probable causes or a warrant. In *Ramsey* the Supreme Court stated:

There has never been any additional requirement that the reasonableness of a border

search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself.

*Ramsey, supra* at 619, 97 S.Ct. at 1980.

**5.** Courts of Appeals from the several circuits, however, have traditionally employed the "reasonable suspicion" standard when construing section 5317(b). *U.S. v. Hernandez–Salazar,* 813 F.2d 1126 (11th Cir.1987).

but conclude that even under the "reasonable suspicion" standard, Customs Inspector Personnett's search of Mr. Obiuwevbi was proper because Obiuwevbi fit within the courier profile of the United States Customs Department. In *U.S. v. Nates*, 831 F.2d 860 (9th Cir.1987) *cert. denied* 487 U.S. 1205, 108 S.Ct. 2845, 101 L.Ed.2d 883, the Court of Appeals for the Ninth Circuit found that a Customs agent had "reasonable cause" to believe that luggage being flown out of United States contained unreported currency and that the agent, therefore, could conduct a warrantless search of the luggage pursuant to the statute because the luggage was bound for Columbia on an airline which was often used by currency smugglers, was heavy and new, and contained no name tags.

The evidence of widespread drug trafficking and money laundering by Nigerians justified the Customs Agent's decision to consider Obiuwevbi's nationality in deciding to search him. The fact that Obiuwevbi is black and is originally from Africa, however, is but an incident of the reason for the Agent's decision to search him. The country of Nigeria and Nigerians traveling to that country were made targets by the Customs Inspectors in Operation Buck Stop. However, not all countries in Africa were made targets by the Customs officials. Nor were all Africans or black persons. Rather, the Customs officials targeted certain countries throughout the world on account of histories of drug trafficking and/or currency violations.

The witnesses who testified for Mr. Obiuwevbi, all of whom were originally from Nigeria, were all very black in color. Afro–Americans, however, are not all of the same exact color (just as all caucasian Americans are not all of the same hue of white). The testifying Nigerians also had dress and speech patterns that were discernable. Observing these characteristics, coupled with the undisputed and overwhelming fact that Nigeria has a very serious problem with drug trafficking, definitely qualifies as a reasonable suspicion necessary to conduct a search under the Fourth Amendment.

A decision to search black persons solely because of their race, or simply because of their African descent would indeed be an injustice and violative of the principles at the core of the Fourth Amendment. However, the overwhelming evidence in this case shows that the Customs Department did *not* target all black persons. It is an undisputed fact—not a statement based on racial prejudice—that the individuals who are most likely to be transporting money illegally out of the country and bringing narcotics back into this country from Nigeria are Nigerians. And those Nigerians happen to be black. It is those persons who were targeted. Moreover, as stated before, it was not the practice of the Customs Inspectors to stop and search all Nigerians. Rather, the Customs officers would stop those acting in a suspicious manner and would not conduct a search until the person stopped demonstrated some further peculiar quality indicative of an awareness of self-guilt. The Government's law enforcement efforts and the national interests of this country would be severely hampered if a quota were set on how many Nigerians the Customs Department could stop and search. Absent a showing of a clear abuse by the Government of the stop and search process towards a particular race or nationality this court will not consider imposing one. The defendant has not come close to making such a showing here.

### IV. Conclusion of Law

As mentioned above, Customs Inspector Personnett noticed that Obiuwevbi was standing at the front of the line waiting to board the plane with his arms folded. Obiuwevbi stared at Inspector Personnett. Obiuwevbi did not turn away when Personnett stared back at him. Personnett was in full uniform. Inspector Personnett formed the belief that Obiuwevbi was conducting himself in the manner of a person that is aware of his own guilt and aware that he is engaging in unlawful conduct. There were also approximately five signs posted in the terminal indicating the currency reporting requirement for outbound passengers. The behavior by Obiuwevbi fit a pattern or

profile of typical currency violators and drug couriers. When the agent spoke with Obiuwevbi he could discern from his heavy accent that Obiuwevbi was of Nigerian origin. The agent, being fully aware of Nigeria's immense drug problem and also aware of Obiuwevbi's suspicious conduct, was then put on alert that something was amiss. After further questioning Obiuwevbi, the agent was quite sure of this. Only then did the agent make a full body search of the defendant. His conduct cannot be said to have been solely based on an irrational prejudice against Africans, or blacks.

Inspector Personnett acted in a manner befitting a Customs Inspector who has studied all of the data collected on international drug trafficking and currency laundering. Personnett also acted based upon his own prior experience in dealing with persons aware of their own illegal conduct. This court believes that Personnett searched Obiuwevbi only after considering all of these factors and forming a reasonable suspicion. This search was not based upon racial prejudice. The court therefore finds that the search of Obiuwevbi was not in violation of the Fourth Amendment, and accordingly, defendant's motion for a new trial is denied.

### ENTER:

Defendant Obiuwevbi's motion for a new trial on the grounds that the evidence obtained against him was obtained pursuant to an unconstitutional search is dismissed. The search was well within the scope of the Fourth Amendment. Defendant shall await sentencing by this court.